FILED

2016 OCT 27  PM 1: 13

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
LOS ANGELES

BY: _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2016 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>LAWRENCE RUBLE KELLY,<br>  aka "Puppet,"<br>  aka "Lil' Puppet,"<br>  aka "Pups,"<br>  aka "P,"<br>ARMANDO SORIANO,<br>  aka "210,"<br>  aka "Mando,"<br>ADAN RODRIGUEZ,<br>  aka "Grizzly,"<br>MARIO DELGADO,<br>  aka "Goblin,"<br>JUAN LOPEZ,<br>  aka "Spanky,"<br>FRANCISCO HERNANDEZ,<br>  aka "Pancho,"<br>JESUS ORTIGOZA,<br>  aka "Chuy,"<br>ERYANNA NEGRETE,<br>  aka "Baby Gangsta,"<br>  aka "Baby G,"<br>OTONIEL GUERRERO,<br>  aka "Twin,"<br>RAUL CORNEJO,<br>ALEJANDRO CALDERON,<br>  aka "Demon,"<br>SUSANNA RODRIGUEZ,<br>JOSE HERNANDEZ AGUIAR,<br>  aka "Big Joe,"<br>DESIREE HERNANDEZ, | CR 15-688(A)<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1962(d): Racketeer<br>Influenced and Corrupt<br>Organizations Conspiracy; 18<br>U.S.C. § 1962(c): Racketeer<br>Influenced and Corrupt<br>Organizations; 18 U.S.C. §§<br>1959(a)(1), (a)(5): Violent Crime<br>in Aid of Racketeering;<br>21 U.S.C. § 846: Conspiracy to<br>Possess with Intent to Distribute<br>and Distribute Methamphetamine; 21<br>U.S.C. §§ 841(a)(1), (b)(1)(A),<br>(b)(1)(B): Possession with Intent<br>to Distribute and Distribution of<br>Methamphetamine; 18 U.S.C.<br>§ 1512(a)(2): Tampering with a<br>Witness or Informant; 18 U.S.C.<br>§ 922(g)(1): Felon in Possession<br>of a Firearm; 18 U.S.C. § 2(a):<br>Aiding and Abetting] |

VOCS:CB

```
 1      aka "Dimples,"
        aka "Dez,"
 2      aka "Deserie,"
     PAUL SORIANO,
 3      aka "Pablo,"
     JEREMY WOODRUFF,
 4      aka "Solo,"
     JOSE BECERRA,
 5      aka "Sinaloa,"
     JAVIER REYNOSO,
 6      aka "Berto,"
     GUADALUPE REYES
 7      aka "Oso,"
     JAVIER FRAUSTO,
 8      aka "Candyman,"
     MIGUEL MACIEL,
 9      aka "Goat,"
     JESSICA FRAUSTO,
10      aka "Lil Jess,"
     MARCOS TAVAREZ,
11   EDWARD WILLIAM GUERRERO,
        aka "Toro,"
12   JUAN CARLOS HERNANDEZ,
        aka "Negro Trece,"
13   ANGELINA GARCIA,
        aka "Little One,"
14   GILBERT LIZALDE,
        aka "Sniper,"
15   NELSON MARTINEZ,
        aka "Lil Torch," and
16   JESSE SANCHEZ,
        aka "Termite,"
17
            Defendants.
18
```

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

A.  GENERAL ALLEGATIONS

1.   At all relevant times, defendants LAWRENCE RUBLE KELLY,
also known as ("aka") "Puppet," aka "Lil' Puppet," aka "Pups," aka
"P" ("L. KELLY"); ARMANDO SORIANO, aka "210," aka "Mando" ("A.
SORIANO"); MARIO DELGADO, aka "Goblin" ("DELGADO"); JUAN LOPEZ, aka
"Spanky" ("LOPEZ"); JESUS ORTIGOZA, aka "Chuy" ("ORTIGOZA");
ALEJANDRO CALDERON, aka "Demon" ("CALDERON"); SUSANNA RODRIGUEZ ("S.

1  RODRIGUEZ"); DESIREE HERNANDEZ, aka "Dimples," aka "Dez," aka
2  "Deserie" ("D. HERNANDEZ"); PAUL SORIANO, aka "Pablo" ("P. SORIANO");
3  JEREMY WOODRUFF, aka "Solo" ("WOODRUFF"); JOSE BECERRA, aka "Sinaloa"
4  ("BECERRA"); MARCOS TAVAREZ ("TAVAREZ"); EDWARD WILLIAM GUERRERO, aka
5  "Toro" ("GUERRERO"); ANGELINA GARCIA, aka "Lil One" ("GARCIA"); and
6  JESSE SANCHEZ, aka "Termite" ("SANCHEZ") (collectively, the
7  "defendants"); and others were members and associates of an
8  organization engaged in, among others things, murder, conspiracy to
9  commit murder, attempted murder, conspiracy to traffic in narcotics,
10 narcotics-trafficking, robbery, extortion, and witness intimidation.
11 At all relevant times, this organization, known as the "Wilmas" gang,
12 which includes "Eastside Wilmas" and "Westside Wilmas" gang members,
13 operated in the Central District of California and elsewhere.  The
14 Wilmas gang, which includes its leadership, membership, and
15 associates, constituted an "enterprise," as defined by Title 18,
16 United States Code, Section 1961(4), that is a group of individuals
17 associated in fact.  The enterprise engaged in, and its activities
18 affected, interstate and foreign commerce.  The enterprise
19 constituted an ongoing organization whose members functioned as a
20 continuing unit for a common purpose of achieving the objectives of
21 the enterprise.

22 B.  BACKGROUND OF THE WILMAS GANG

23      2.  The Wilmas gang is a multi-generational street gang that
24 has existed for more than 60 years and claims the area roughly
25 bounded by Harry Bridges Boulevard on the south, the Harbor Freeway
26 on the west, Alameda Street on the east, and Lomita Boulevard on the
27 north as its "territory," or "turf," in Southeast Los Angeles and the
28 community of Wilmington, from which the organization derives its

3

1    name.  The Wilmas gang is divided into "Eastside" and "Westside"
2    Wilmas, and those segments are further divided into further subsets,
3    or "cliques."  These are "Hyatt Street," "Mahar," and "L Street,"
4    within the "Eastside Wilmas," and primarily the "Wilhall Park"
5    clique, within the "Westside Wilmas."  While ostensibly separated as
6    "Eastside" and "Westside," Wilmas gang members frequently associate,
7    reside in each other's territory, and combine to commit the crimes of
8    the organization and under the larger direction and authority of the
9    Mexican Mafia, a prison-based gang in California that controls many
10   of the Hispanic street gangs in and around Los Angeles.  Revenue in
11   the form of "taxed" proceeds from the crimes of the organization is
12   collected by Wilmas gang leaders and, in turn, required to be paid as
13   "tribute" to the overall organization and Mexican Mafia leaders,
14   including Wilmas gang members who have become "made" members of the
15   Mexican Mafia.  Mexican Mafia leaders then direct the activities of
16   the Wilmas gang from within the California State Prison system,
17   authorize the roles and responsibilities of members within the
18   organization, and exact the Mexican Mafia's portion of the revenues
19   generated from the crimes they commit.

20        3.   Wilmas gang members both identify themselves and threaten
21   rivals by hand gestures, referred to as "throwing" gang "signs."
22   Commonly for the Wilmas, the "sign" is to form the letter "W" and
23   gesture in a way that identifies members to each other, threatens
24   rival gang members, or intimidates the general public.  Members also
25   frequently display tattoos with words or letters to identify the
26   Wilmas gang, "Eastside" or "Westside" factions, or particular
27   "cliques" within the gang structure, among other violent or
28   threatening tattoos.  Wilmas gang members also commonly use terms to

4

1   represent the geographic harbor area of Los Angeles, where the gang

2   is based.  Hence, the letters "HA" are used by the gang to signify

3   the "Harbor Area," as well as "Wilmero," which is used to refer to a

4   person from Wilmington.  Wilmas gang members and associates also

5   frequently include the number "13" and other representations of the

6   letter "M" or "sureno" in the tattoos and "tagging" as a means to

7   demonstrate their loyalty to and support from the Mexican Mafia.

8   Sports paraphernalia is also used to identify gang, sect, or clique

9   membership.  For example, the cap for the St. Louis Cardinals

10  baseball team might be worn by an "L Street" clique member, because

11  the "St L" logo worn by the baseball team can be viewed as

12  representing "L St."

13       4.   The Wilmas gang also "tags" buildings and signs as a means

14  to demonstrate its control over the gang's territory, or "turf," to

15  both rival gang members and members of the local community.

16  "Tagging" is not a mere casual act of vandalism.  Rather, it is a

17  means of intimidation, intended to induce fear in the general public,

18  rival gang members, and law enforcement.  Victimized residents and

19  business owners are not permitted to remove or paint over gang marks,

20  because the gang uses "tagging" as a public assertion of its

21  authority.  "Tagging" identifies otherwise private homes and

22  buildings within Wilmas gang territory as controlled by the gang and

23  subject to its authority.  It is a statement that the home, business,

24  or structure belongs to the gang, not the resident or business owner.

25  The tagged message is also a threat to rival gang members, the

26  community, and even to law enforcement, that the neighborhood and

27  persons within it are under the control of the Wilmas gang.  Tagged

28  messages, therefore, frequently include gang and clique names, as

5

well as overt and coded threats of violence and murder, such as the number 187, which identifies the section of the California Penal Code that criminalizes murder.  The number 187, therefore, is intended to signify that the gang has killed persons in its territory and will continue to kill those who oppose the gang.  The letters "DTK" also appear frequently, to convey that the Wilmas gang is "down to kill." Additionally, "f*ck the weak" and the word "snitches" crossed over carry the message that persons cooperating with law enforcement against the Wilmas gang will be killed.

5.    The Wilmas gang controls its territory through intimidation and acts of violence directed against law enforcement, rival gang members, fellow Wilmas gang members, and the general public.  As a result, the relatively small community of Wilmington has suffered a substantial number of murders and deadly assaults, and the Wilmas gang is believed to be responsible for a substantial portion of the gang crime within the Harbor Division of the Los Angeles Police Department.  Wilmas gang members have also established a history of attacks on law enforcement officers conducting patrol in Wilmas gang territory, including incidents like the one that occurred on April 2, 2008, when Wilmas gang member David Sedillo fired multiple rounds at Los Angeles Police Department Officers, striking one officer in the chest; January 31, 2012, when three Wilmas gang members, including a Wilmas "shot-caller," fired at officers from a barricaded position in Wilmas gang territory; and, again, on February 13, 2013, when a Wilmas gang member repeatedly shot at law enforcement officers in Wilmas gang territory and tried to escape from the officers in a stolen car.

6.  The Wilmas gang is also a racist organization and has been historically antagonistic to the presence of African-Americans in Wilmas gang territory.  Wilmas gang members have frequently targeted African-Americans who enter or attempt to reside within the area claimed by the Wilmas gang.

7.  The Wilmas gang is frequently engaged in the distribution of narcotic drugs, especially methamphetamine.  The Mexican Mafia and Mexican Mafia leaders exercise authority over the distribution of narcotics and the profits from narcotics trafficking by Wilmas gang members, directing members to work together as a means to maintain the profits from narcotics distribution and other crimes of the organization.  "Eastside" and "Westside" Wilmas gang members, therefore, combine to supply narcotics to one another for distribution and, in turn, distribute narcotics within Wilmas gang territory, as well as to control the distribution of narcotics by preventing the incursion of rival gang members and narcotics-traffickers and "taxing" associate narcotics-traffickers in Wilmas gang territory.  Wilmas gang members also combine for purposes of assessing and collecting "taxes" within Wilmas gang territory and verifying that "taxed" narcotics proceeds are properly paid to the larger organization and as directed by the Mexican Mafia.

8.  Wilmas gang members also maintain and distribute a ready supply of firearms, including handguns, shotguns, and assault rifles in order to protect their narcotics-distribution trade, carry out attacks in the neighborhood, and to enforce the authority of the gang within its territory.  Firearms are frequently stolen or unregistered, so that their use in the commission of violent crimes cannot be readily connected to the gang member responsible for the

offense.   Traceable firearms typically need to be discarded or destroyed after they have been used in a crime.   As a result, gang members need consistent access to a ready supply of unregistered or stolen firearms and the means to sell surreptitiously weapons that they have used to commit crimes.   The trade and sale of firearms by Wilmas gang members is, therefore, commonplace, both as a means of obtaining replacement firearms and to dispose of firearms that have recently been used in the commission of a violent crime.

9.   Wilmas gang members and associates are typically undeterred from the commission of crimes by arrests or periods of incarceration and will often continue to plan and execute crimes while in custody. Hence, incarcerated gang members make use of telephone calls from inside detention facilities, prison notes (known as "kites"), meetings among inmates within an institution, and prison visits, as means to continue to coordinate and conduct the crimes of the organization, despite incarceration.   Unincarcerated members and associates also frequently coordinate with incarcerated members in order to continue to commit crimes and maintain the role of the incarcerated members in the crimes of the organization and upon their release from prison.

10.   Female gang members and associates play a substantial role in narcotics-trafficking, weapons distribution, the collection and transfer of "taxes" and narcotics proceeds, armed assaults, murders, and the maintenance of communications within the larger organization, among both "outside" members and associates and long-term incarcerated Wilmas and Mexican Mafia leadership.   Females are also frequently responsible to direct telephone communications and, at times, operate as the "secretary" to a Mexican Mafia leader, managing

directions, "kites," and "taxes" to and from that Mexican Mafia leader.

11.  Wilmas gang members enforce the authority of the gang to commit its crimes by directing acts of violence and retaliation against non-compliant drug-traffickers operating within Wilmas gang territory, as well as non-compliant Wilmas gang members and members of the general public.  Wilmas gang members also threaten and carry out attacks against persons whom they suspect might testify or provide information to law enforcement about crimes committed by the gang.  The Wilmas gang controls and terrorizes the community through violence and intimidation, open threats and murder, all of which has culminated in a neighborhood that is beyond the rule of law.

12.  The State of California issued an injunction against the "Eastside" and "Westside Wilmas" on May 23, 2001 and again on March 9, 2004 ("the Gang Injunction") to restrict the activities of the gang as a public nuisance and specifically named defendants L. KELLY, SANCHEZ, and others in the injunction.  Law enforcement officers have served the Gang Injunction on documented members of the Wilmas gang as a means to notify the members and enforce the restrictions of the Gang Injunction.  The Gang Injunction also describes the criminal nature of the organization and characteristic crimes committed by "Eastside" and "Westside" members of the Wilmas gang.

C.  MEXICAN MAFIA AUTHORITY FOR THE WILMAS GANG

13.  The Wilmas gang is a surenos gang, which means that it is loyal to, supports, and contributes to the "Mexican Mafia," also known as "La Eme."  The Mexican Mafia is a prison gang that was organized within the California State Prison system in order to control and direct the activities of Southern California street

9

1   gangs.  "Made" members of the Mexican Mafia have assumed authority

2   for different regions in Southern California.  Typically, a "made"

3   member is an inmate within the California State Prison system and

4   exercises his control and direction over the region from within the

5   state prison facility where he is housed.  Some members are also out

6   of custody and, therefore, able to exercise authority directly from

7   within neighborhoods and communities in Southern California and

8   elsewhere.  The Mexican Mafia leaders issue directions and orders,

9   including orders to kill rival gang members, members of law

10   enforcement, and members of the public, which are referred to as

11   "green lights."  Those orders are to be executed by surenos gang

12   members and are understood by surenos gang members as carrying the

13   opportunity to elevate their status within the organization or

14   potentially to become a "made" member, referred to as a "brother," of

15   the organization.

16       14.  The Mexican Mafia has established rules to govern acts of

17   violence committed by local street gang members, including Wilmas

18   gang members.  The Mexican Mafia, thus, requires members to adhere to

19   protocols for the conduct of violent attacks, narcotics trafficking,

20   and murders, including the issuance of "green light" authorizations

21   for murder.  Failure to adhere to Mexican Mafia rules can also lead

22   to the issuance of a "green light," directing an attack on the

23   offending member, or the requirement that money be paid to the

24   organization.  "Green lights" are also frequently issued in

25   retaliation for a perceived "disrespect" to a Mexican Mafia leader,

26   to punish the unauthorized collection of "tax" payments in a

27   neighborhood controlled by the gang, or to sanction individuals who

28   traffic in narcotics without the gang's authorization or without

paying the required "tax" to the Wilmas and Mexican Mafia, or who delay in paying "taxes." "Green lights" may be executed by Mexican Mafia, surenos gang members, or others seeking to gain favor or status with the Mexican Mafia and gang community.

15. Mexican Mafia and Wilmas gang members and associates regularly exploit prison visits, telephone calls, policies concerning letter-communications with attorneys, and prison monetary accounts in order to generate income from narcotics trafficking and other crimes of the enterprise, in order to promote the criminal enterprise and direct the operation of Wilmas gang from within the California State Prison system. Mexican Mafia leaders also require regular payments from prisoners incarcerated in the Los Angeles County Jail system.

16. Wilmas gang leaders extort money from local narcotics traffickers, Wilmas gang members, members of other street gangs, residents and persons who maintain businesses in the area claimed by the gang. A portion of the "taxes" collected by the Wilmas gang is then paid to the Mexican Mafia leadership incarcerated within the California State Prison system and exercising control in the community. "Taxes" are often paid as covert deliveries to Post Office boxes and deposited into prison bank accounts for Mexican Mafia members incarcerated within the California state prison system.

D. MEXICAN MAFIA LEADERSHIP AND OPERATION

17. At least four Wilmas gang members have been validated Mexican Mafia "brothers." They include Mexican Mafia Member #1, Mexican Mafia Member #2, and, formerly, Mexican Mafia Member #3. Mexican Mafia "brothers" exercise authority over the Wilmas gang and Wilmas gang territory, dividing up neighborhoods within Southern California and elsewhere for the collection of "taxes," distribution

1    of narcotics and other crimes.  The recently deceased Mexican Mafia

2    Member #3 was also a Mexican Mafia member who had been released from

3    custody.  As such, Mexican Mafia Member #3 was able to exercise

4    authority over the Wilmas gang and assert the interests of other,

5    incarcerated Mexican Mafia members who are entitled to receive

6    "taxes" collected from Wilmas gang members and issue directions to

7    them.  Mexican Mafia members also use Mexican Mafia leaders and high-

8    ranking gang members and associates, including defendants L. KELLY,

9    A. SORIANO, and ORTIGOZA, to collect "taxes" and execute directives

10   from the Mexican Mafia leadership.

11         18.  The Mexican Mafia leadership also relies significantly on

12   the support of "secretaries," who operate as conduits for the

13   organization and its leadership.  Because Mexican Mafia leaders are

14   frequently incarcerated, some serving lifetime sentences, and

15   sometimes segregated from other inmates, Mexican Mafia leaders

16   frequently use specific "secretaries" to transport and deliver

17   communications, "kites," and "tax" payments and manage proceeds of

18   the criminal enterprise.  "Kites" conceal coded messages that are

19   frequently disguised and hidden in magazines and letters sent to and

20   from the California state prisons, which then communicate the

21   directions and orders of the Mexican Mafia for the Wilmas and other

22   surenos gangs.

23   E.   PURPOSES OF THE ENTERPRISE

24         19.  The purposes of the Wilmas gang, include, but are not

25   limited to, the following:

26              a.   Enriching members of the Wilmas gang and Mexican Mafia

27   through, among other things, the control of and participation in the

28

                                    12

distribution of narcotics in the territory controlled by the Wilmas gang.

b.   Maintaining the control and authority of the Wilmas gang over the neighborhoods it controls, often through threats and acts of violence.

c.   Preserving, protecting, and expanding the power of the Wilmas gang through the use of intimidation, violence, threats of violence, assault, and murder.

d.   Promoting and enhancing the authority of the Wilmas gang members and associates.

20.   The means and methods by which the defendants and their co-racketeers conduct and participate in the conduct of the affairs of the Wilmas gang include:

a.   Members of the Wilmas gang commit, attempt, and threaten to commit acts of violence to protect and expand the enterprise criminal operation, including assaults, murder, intimidation, and threats of violence directed against each other, rival gang members, members of law enforcement, and potential witnesses in criminal prosecutions.

b.   Members of the Wilmas gang promote a climate of fear and terrorize the community through acts of violence and threats to commit acts of violence.

c.   To enforce the authority of the Wilmas gang, members use the enterprise to murder, attempt to murder, assault, and threaten those who pose a threat to the enterprise.

d.   Participants in the Wilmas gang engage in trafficking controlled substances and extorting proceeds from the sale of controlled substances as a means to generate income.

13

COUNT ONE

[18 U.S.C. § 1962(d)]

1.    Paragraphs One through Twenty of the Introductory Allegations of this First Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

A.    THE OBJECT OF THE CONSPIRACY

2.    Beginning on a date unknown, and continuing to on or about October 27, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendants L. KELLY, A. SORIANO, DELGADO, J. LOPEZ, ORTIGOZA, CALDERON, S. RODRIGUEZ, D. HERNANDEZ, P. SORIANO, WOODRUFF, BECERRA, TAVAREZ, E. GUERRERO, GARCIA, and SANCHEZ, and others, being persons employed by and associated with the Wilmas criminal enterprise, which enterprise engaged in and the activities of which affected interstate and foreign commerce, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1962, that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts involving murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 189, 217.1, and 664; extortion, in violation of California Penal Code Sections 21a, 31, 182, 518, 519, 520, and 664; conspiracy to distribute and distribution of controlled substances, including methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and witness tampering, in violation of Title 18, United States Code, Section 1512.  It was further part of the conspiracy that each

14

1    defendant agreed that a conspirator would commit at least two acts of

2    racketeering in the conduct of the affairs of the enterprise.

3    B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

4          ACCOMPLISHED

5          3.    The object of the conspiracy was to be accomplished in

6    substance as follows:

7                a.    Mexican Mafia leaders and associates, including

8    Mexican Mafia Member #1, Mexican Mafia Member #2, Mexican Mafia

9    Member #3, Mexican Mafia Member #4, defendants L. KELLY, A. SORIANO,

10   and ORTIGOZA, and others would meet with Wilmas gang leaders and

11   direct the activities of the Wilmas gang, including the distribution

12   of narcotics and the collection and distribution of "taxed" drug

13   proceeds, and would authorize and direct acts of violence, including

14   the attacks on and killing of rival gang members, non-compliant

15   narcotics traffickers, law enforcement officers, and members of the

16   public, both from within the California State Prison system and in

17   the neighborhoods claimed by the Wilmas gang as its territory.

18                b.    Defendants L. KELLY, A. SORIANO, DELGADO, J. LOPEZ,

19   CALDERON, and WOODRUFF, and others would carry out armed attacks

20   against law enforcement officers, rival gang members, non-compliant

21   narcotics-traffickers, suspected witnesses, and others in order to

22   promote and further the activities of the Wilmas gang.

23                c.    Defendants L. KELLY, A. SORIANO, DELGADO, J. LOPEZ,

24   CALDERON, S. RODRIGUEZ, D. HERNANDEZ, P. SORIANO, WOODRUFF, BECERRA,

25   TAVAREZ, E. GUERRERO, GARCIA, and SANCHEZ, and others would obtain

26   and distribute narcotics in the areas controlled by the Wilmas gang

27   and inside California State Prisons.

28

1          d.     Defendants L. KELLY, A. SORIANO, and ORTIGOZA, and

2     others, would extort payments from narcotics traffickers, business

3     owners, and others in Wilmas gang territory under threats that

4     payment was required by the Mexican Mafia.

5          e.     Defendants L. KELLY, A. SORIANO, DELGADO, J. LOPEZ,

6     CALDERON, S. RODRIGUEZ, TAVAREZ, and E. GUERRERO, and others, would

7     maintain, use, and distribute firearms to Wilmas gang members and

8     others in Wilmas gang territory.

9          f.     Defendants DELGADO, S. RODRIGUEZ, P. SORIANO,

10    WOODRUFF, and GARCIA, and others, would assist Wilmas gang members in

11    the commission and violent crimes and narcotics trafficking, as well

12    as the concealment of those offenses from law enforcement, by

13    disposing of evidence of crimes or threatening witnesses to those

14    crimes.

15    C.    OVERT ACTS

16         4.     In furtherance of the conspiracy, and to accomplish the

17    object of the conspiracy, on or about the following dates, defendants

18    L. KELLY, A. SORIANO, DELGADO, J. LOPEZ, ORTIGOZA, CALDERON, S.

19    RODRIGUEZ, D. HERNANDEZ, P. SORIANO, WOODRUFF, BECERRA, TAVAREZ, E.

20    GUERRERO, GARCIA, and SANCHEZ, and others known and unknown to the

21    Grand Jury, committed various overt acts, within the Central District

22    of California, and elsewhere, including, but not limited to, the

23    following:

24    Overt Act No. 1:    On September 30, 2000, defendant SANCHEZ

25    possessed a Winchester 12 gauge shotgun, bearing serial number

26    L2409924, a Derringer 2 shot pistol, and ammunition in Wilmas gang

27    territory.

28

1    Overt Act No. 2:    On March 7, 2006, defendant S. RODRIGUEZ and

2  an unindicted co-conspirator possessed individual plastic bags

3  containing approximately 6.25 grams of methamphetamine, packaging

4  material, scales, spoons, syringes, and a credit card belonging to

5  another person in Wilmas gang territory.

6    Overt Act No. 3:    On November 3, 2007, defendant L. KELLY and

7  an unindicted co-conspirator extorted payment from H.H. after a

8  Wilmas gang member discarded a firearm in H.H.'s yard, while fleeing

9  from law enforcement, and H.H. assisted law enforcement officers in

10  seizing the firearm.

11    Overt Act No. 4:    On March 13, 2008, a Wilmas gang member shot

12  at law enforcement officers in an attempt to kill them in Wilmas gang

13  territory.

14    Overt Act No. 5:    On April 2, 2008, a Wilmas gang member led

15  law enforcement officers on a high speed chase through Wilmas gang

16  territory and attempted to kill the officers by shooting at them with

17  a .22 caliber revolver handgun, striking Officer A.M. in the chest.

18    Overt Act No. 6:    On October 21, 2010, defendant CALDERON

19  attempted to escape from law enforcement officers in order to avoid

20  being caught with shotgun shells, a knife, and methamphetamine in

21  Willhall Park, within Wilmas gang territory.

22    Overt Act No. 7:    On February 15, 2011, defendant E. GUERRERO

23  possessed a loaded High Standard .22 caliber revolver, bearing serial

24  number 1626358, and eight rounds of ammunition, as he attempted to

25  escape from law enforcement officers in Wilmas gang territory.

26    Overt Act No. 8:    On January 23, 2012, defendant CALDERON

27  possessed methamphetamine in Wilmington, California.

28

Overt Act No. 9:    On January 31, 2012, defendant E. GUERRERO and two other Wilmas gang members "threw" Wilmas gang signs at law enforcement officers and barricaded themselves in an alley, while one of the Wilmas gang members attempted to kill law enforcement officers by shooting at the officers with a .38 Special handgun.

Overt Act No. 10:    On February 17, 2012, defendant A. SORIANO possessed a loaded Smith and Wesson .357 revolver, bearing serial number AED5947, and six rounds of ammunition, while riding in a car with two other Wilmas gang members; and defendant A. SORIANO attempted to escape from law enforcement officers when they attempted to arrest him in Wilmas gang territory.

Overt Act No. 11:    On February 26, 2012, Wilmas gang members shot 16-year-old M.M. to death on Bay View Avenue in Wilmington, and executed 16-year-old C.R. by shooting her in the head 10 times with a 9 mm handgun as she tried to escape by hiding between parked cars.

Overt Act No. 12:    On May 12, 2012, defendant BECERRA met with a confidential government informant and discussed arrangements to transport narcotics between Los Angeles, California, Arizona, and Nevada.

Overt Act No. 13:    On June 6, 2012, defendant BECERRA sold approximately 26.4 grams of methamphetamine to a confidential government informant.

Overt Act No. 14:    On July 2, 2012, defendant BECERRA offered to sell methamphetamine and a firearm to a confidential government informant.

Overt Act No. 15:    On July 3, 2012, defendant BECERRA sold 26.2 grams of methamphetamine to a confidential government informant and

1   possessed a .357 caliber revolver handgun, which BECERRA also offered

2   to sell to the informant.

3       Overt Act No. 16:   On July 9, 2012, defendant BECERRA possessed

4   methamphetamine and a .357 caliber revolver handgun in Wilmas gang

5   territory.

6       Overt Act No. 17:   On July 22, 2012, Wilmas gang members shot

7   E.P. and I.Z. in an alley in Wilmington, California, killing E.P.

8       Overt Act No. 18:   On September 5, 2012, defendant TAVAREZ told

9   a confidential government informant that he had multiple firearms to

10  sell, provided his telephone number, and offered to sell a shotgun to

11  the informant in Wilmas gang territory.

12      Overt Act No. 19:   On September 25, 2012, defendant TAVAREZ

13  offered to sell a pump action shotgun to a confidential government

14  informant for $450.

15      Overt Act No. 20:   On September 26, 2012, by telephone using

16  coded language, a Wilmas gang member used defendant E. GUERRERO's

17  telephone to arrange to sell two ounces of methamphetamine to a

18  confidential government informant.

19      Overt Act No. 21:   On September 26, 2012, defendant E. GUERRERO

20  and another Wilmas gang member sold approximately 45.0 grams of

21  methamphetamine to a confidential government informant for $1,300 at

22  a residence on Bay View Avenue in Wilmas gang territory.

23      Overt Act No. 22:   On October 16, 2012, defendant E. GUERRERO

24  possessed a loaded Smith and Wesson .40 caliber handgun, bearing

25  serial number PBH2190, and attempted to escape from law enforcement

26  officers by fleeing into a residence in Wilmas gang territory and

27  discarding his weapon and clothes.

28

1    Overt Act No. 23:   On October 18, 2012, defendant TAVAREZ sold

2  a Jing An, model HL12-102, 12-gauge pump action shotgun with a pistol

3  grip, bearing serial number 9604729, a Derringer style handgun, and 5

4  rounds of .22 caliber ammunition to a confidential government

5  informant at an automotive shop in Wilmas gang territory.

6    Overt Act No. 24:   On October 30, 2012, by telephone using

7  coded language, a Wilmas gang member told defendant E. GUERRERO that

8  a Wilmas gang leader had called her on behalf of defendant L. KELLY,

9  demanding payment for methamphetamine that defendant E. GUERRERO had

10  obtained from defendant L. KELLY before defendant E. GUERRERO became

11  incarcerated, that the Wilmas gang member would pay $1000 to

12  defendant L. KELLY, then sell narcotics for defendant L. KELLY to pay

13  the remainder of what defendant E. GUERRERO owed, and defendant E.

14  GUERRERO directed the Wilmas gang member to have defendant L. KELLY

15  deliver "work" to her, rather than going to defendant L. KELLY's

16  residence, and agreed to call defendant L. KELLY to arrange for

17  defendant L. KELLY to supply narcotics to the Wilmas gang member.

18    Overt Act No. 25:   On October 30, 2012, by telephone using

19  coded language, a Wilmas gang member told defendant E. GUERRERO that

20  she had $1,300 to pay defendant L. KELLY.

21    Overt Act No. 26:   On October 30, 2012, by telephone using

22  coded language, defendant E. GUERRERO told defendant L. KELLY that E.

23  GUERRERO had $1,300 to pay for the methamphetamine he had purchased

24  from defendant L. KELLY and that another Wilmas gang member would

25  sell narcotics for L. KELLY, and L. KELLY told defendant E. GUERRERO

26  that L. KELLY had directed another Wilmas gang leader to collect the

27  payment from the Wilmas gang member.

28

1    <u>Overt Act No. 27:</u>   On October 30, 2012, by telephone using
2    coded language, a Wilmas gang member told defendant E. GUERRERO that
3    she had no money and only a half-ounce of methamphetamine, and
4    defendant E. GUERRERO told the Wilmas gang member to contact
5    defendant L. KELLY to obtain more methamphetamine.

6    <u>Overt Act No. 28:</u>   On October 31, 2012, by telephone using
7    coded language, defendant E. GUERRERO told another Wilmas gang member
8    that she would be arrested if she came to the prison where he was
9    incarcerated and that she should get identification for someone who
10   looked like her.

11   <u>Overt Act No. 29:</u>   On November 2, 2012, by telephone using
12   coded language, a Wilmas gang member agreed to provide
13   methamphetamine to defendant E. GUERRERO while he was incarcerated.

14   <u>Overt Act No. 30:</u>   On November 4, 2012, by telephone using
15   coded language, a Wilmas gang member told defendant E. GUERRERO that
16   defendant L. KELLY was not answering her telephone calls, and
17   defendant E. GUERRERO told the gang member how to obtain narcotics
18   from the source.

19   <u>Overt Act No. 31:</u>   On November 4, 2012, by telephone using
20   coded language, a Wilmas gang member told defendant E. GUERRERO that
21   she would use the identification for G.V. when she brought narcotics
22   to defendant E. GUERRERO while he was incarcerated.

23   <u>Overt Act No. 32:</u>   On November 7, 2012, by telephone using
24   coded language, a Wilmas gang member told defendant E. GUERRERO that
25   she had not heard from defendant L. KELLY or another Wilmas gang
26   member, but that she had obtained proceeds from narcotics sales and
27   "taxes" that had been paid.

28

1     Overt Act No. 33:   On November 7, 2012, defendant TAVAREZ

2 offered to sell an AK-47 assault rifle to a confidential government

3 informant for $1500.

4     Overt Act No. 34:   On November 10, 2012, a Wilmas gang member

5 used G.V.'s identification in order to gain access and attempted to

6 deliver approximately 11.6 grams of methamphetamine to defendant E.

7 GUERRERO at the Pitchess Detention Center in Castaic, California.

8     Overt Act No. 35:   On November 10, 2012, by telephone using

9 coded language, a Wilmas gang member asked an unindicted co-

10 conspirator to provide the Wilmas gang member with identifying

11 information for G.V., so that she could attempt to persuade officers

12 that she was actually G.V., after the gang member was arrested for

13 attempting to smuggle methamphetamine to defendant E. GUERRERO,

14 inside the Pitchess Detention Center in Castaic, California.

15     Overt Act No. 36:   On November 12, 2012, by telephone using

16 coded language, defendant TAVAREZ told a confidential government

17 informant that he had sold the "cuerno" assault rifle, but that he

18 would sell two handguns to the informant for $900.

19     Overt Act No. 37:   On November 12, 2012, by telephone using

20 coded language, defendant E. GUERRERO asked an unindicted co-

21 conspirator to assist in providing bail for another Wilmas gang

22 member after her arrest and to assault another person "in the West

23 way."

24     Overt Act No. 38:   On November 14, 2012, defendant TAVAREZ sold

25 a Ruger GP100 .357 caliber revolver, bearing serial number 170-77412;

26 a Colt Cobra .32 caliber revolver, bearing serial number H95548; five

27 rounds of .357 caliber ammunition; and 17 rounds of .32 caliber

28 ammunition at an automotive shop in Wilmington, California, and

1  defendant TAVAREZ told the informant that he would advise the

2  informant when defendant TAVAREZ had larger firearms available.

3     Overt Act No. 39:  On November 15, 2012, defendant CALDERON

4  identified himself as "Demon" and a "Westside Wilmas" gang member

5  when law enforcement officers arrested him in Wilmas gang territory.

6     Overt Act No. 40:  On December 13, 2012, defendant TAVAREZ

7  possessed a Mossberg .410 gauge shotgun at an automotive shop in

8  Wilmington, California.

9     Overt Act No. 41:  On December 18, 2012, by telephone using

10  coded language, defendant TAVAREZ offered to sell a Mossberg .410

11  gauge shotgun to a confidential government informant.

12     Overt Act No. 42:  On December 19, 2012, defendant TAVAREZ and

13  an unidentified co-conspirator sold a Mossberg .410 gauge shotgun,

14  bearing serial number H949614, to a confidential government informant

15  at an automotive shop in Wilmington, California.

16     Overt Act No. 43:  On January 21, 2013, defendant DELGADO and

17  two other Wilmas gang members murdered E.T. by shooting E.T. seven

18  times with two 9 mm handguns, in Wilmas gang territory.

19     Overt Act No. 44:  On January 24, 2013, defendant S. RODRIGUEZ

20  sold a Mossberg .410 gauge shotgun, bearing serial number K255074,

21  and a bulletproof vest to a confidential government informant in an

22  apartment in Wilmas gang territory.

23     Overt Act No. 45:  On January 30, 2013, defendant S. RODRIGUEZ

24  delivered the trigger assembly for a shotgun defendant S. RODRIGUEZ

25  had previously sold to a confidential government informant on January

26  24, 2013.

27     Overt Act No. 46:  On February 4, 2013, defendant CALDERON

28  offered to sell a .38 caliber handgun and a 9 mm handgun to a

confidential government informant, but warned the informant that defendant CALDERON had "burned" the 9 mm handgun by using it in a shooting.

Overt Act No. 47:   On February 4, 2013, defendant S. RODRIGUEZ arranged for a confidential government informant to meet with defendant J. LOPEZ in order to buy methamphetamine from defendant J. LOPEZ.

Overt Act No. 48:   On February 6, 2013, defendants CALDERON and S. RODRIGUEZ possessed and displayed a .44 caliber handgun during a meeting with a confidential government informant.

Overt Act No. 49:   On February 6, 2013, defendant J. LOPEZ provided his telephone number and agreed to sell three ounces of methamphetamine to a confidential government informant.

Overt Act No. 50:   On February 12, 2013, defendant J. LOPEZ sold approximately 82.4 grams of methamphetamine to a confidential government informant, in exchange for $1,650, at an apartment in Wilmas gang territory.

Overt Act No. 51:   On February 13, 2013, defendant CALDERON and two other Wilmas gang members attempted to kill law enforcement officers by shooting at the officers with a Smith and Wesson .40 caliber handgun, bearing serial number PBA 8515, while driving a stolen car near Wilhall Park, in Wilmas gang territory.

Overt Act No. 52:   On February 16, 2013, defendant A. SORIANO drove in a car with two other Wilmas gang members and threw gang signs at other cars in Wilmas gang territory.

Overt Act No. 53:   On March 5, 2013, a Wilmas gang member demanded $4,500 to remove a "green light" imposed by Mexican Mafia members against a confidential government informant.

1    Overt Act No. 54:   On March 12, 2013, defendant J. LOPEZ sold

2  approximately 83 grams of methamphetamine to a confidential

3  government informant for $1,650, at an apartment in Wilmas gang

4  territory.

5    Overt Act No. 55:   On April 15, 2013, defendant J. LOPEZ sold

6  approximately 82.2 grams of methamphetamine to a confidential

7  government informant for $1,650, at an apartment in Wilmas gang

8  territory.

9    Overt Act No. 56:   On May 16, 2013, by text message using coded

10  language, defendant A. SORIANO agreed to sell two ounces of "good"

11  methamphetamine to a confidential government informant for $1,200,

12  and then agreed to reduce the price to $1,100.

13    Overt Act No. 57:   On June 4, 2013, by telephone using coded

14  language, defendant J. LOPEZ told a co-conspirator that there had not

15  been any complaints about the quality of methamphetamine the co-

16  conspirator had provided.

17    Overt Act No. 58:   On June 5, 2013, by telephone using coded

18  language, defendant A. SORIANO agreed to sell one ounce of

19  methamphetamine to a confidential government informant for $500.

20    Overt Act No. 59:   On June 6, 2013, defendant A. SORIANO told a

21  confidential government informant that A. SORIANO was not able to

22  deliver methamphetamine at that time, because "it's been hot.   I did

23  a shooting last week."

24    Overt Act No. 60:   On June 6, 2013, by telephone using coded

25  language, defendant J. LOPEZ agreed to deliver one ounce of

26  methamphetamine to another Wilmas gang member.

27

28

Overt Act No. 61: On June 6, 2013, by telephone using coded language, defendant SANCHEZ agreed to deliver $300 of drug proceeds to defendant J. LOPEZ at J. LOPEZ' residence.

Overt Act No. 62: On June 7, 2013, by text message using coded language, a Wilmas gang member advised defendant J. LOPEZ that the Wilmas gang member had $200 to pay for one half-ounce of methamphetamine and wanted to purchase a full ounce of methamphetamine from defendant J. LOPEZ that day.

Overt Act No. 63: On June 8, 2013, by text messages using coded language, defendant SANCHEZ told defendant J. LOPEZ that defendant SANCHEZ had $300 and wanted to purchase additional methamphetamine from defendant J. LOPEZ.

Overt Act No. 64: On June 8, 2013, by text message using coded language, a co-conspirator arranged to deliver methamphetamine to defendant J. LOPEZ.

Overt Act No. 65: On June 10, 2013, by text messages using coded language, a Wilmas gang member arranged to purchase one ounce of methamphetamine from defendant J. LOPEZ for $400, and defendant J. LOPEZ told the gang member to be careful when coming to defendant J. LOPEZ' residence.

Overt Act No. 66: On June 12, 2013, by text messages using coded language, defendant SANCHEZ told defendant J. LOPEZ that defendant SANCHEZ had $250 in drug proceeds for defendant J. LOPEZ.

Overt Act No. 67: On June 13, 2013, by telephone using coded language, a Wilmas gang member told defendant J. LOPEZ that drug sales were slow but that the gang member had sold almost all of the drugs in his possession and had at least $1,000 in drug proceeds that he would deliver to defendant J. LOPEZ later that day.

Overt Act No. 68:   On June 14, 2013, by telephone using coded language, defendant SANCHEZ asked to meet with defendant J. LOPEZ to deliver drug proceeds to defendant J. LOPEZ, and defendant J. LOPEZ said that defendant SANCHEZ should deliver the money to another Wilmas gang member instead.

Overt Act No. 69:   On June 15, 2013, by telephone using coded language, a Wilmas gang member told defendant J. LOPEZ that he had drug proceeds to deliver to defendant J. LOPEZ, and defendant J. LOPEZ and the Wilmas gang member discussed the need to avoid detection by law enforcement.

Overt Act No. 70:   On June 16, 2013, by telephone using coded language, defendant J. LOPEZ asked a co-conspirator to deliver methamphetamine to defendant J. LOPEZ' residence.

Overt Act No. 71:   On June 18, 2013, by telephone using coded language, a Wilmas gang member told defendant J. LOPEZ that the gang member needed to dispose of one-and-a-half ounces of methamphetamine to avoid being caught by law enforcement.

Overt Act No. 72:   On June 18, 2013, by telephone using coded language, a Wilmas gang member asked defendant J. LOPEZ if J. LOPEZ had methamphetamine available, and J. LOPEZ told the Wilmas gang member to come to J. LOPEZ' residence, because he did not want to discuss narcotics sales over the telephone.

Overt Act No. 73:   On June 19, 2013, by telephone using coded language, defendant J. LOPEZ agreed to deliver methamphetamine to a Wilmas gang member at defendant J. LOPEZ' residence on Flint Street in Wilmington, California.

Overt Act No. 74:   On June 19, 2013, a Wilmas gang member drove to defendant J. LOPEZ' residence and obtained methamphetamine from defendant J. LOPEZ.

Overt Act No. 75:   On June 19, 2013, by telephone using coded language, a Wilmas gang member arranged to deliver proceeds from her recent methamphetamine sale to defendant J. LOPEZ at his residence.

Overt Act No. 76:   On June 19, 2013, by text message using coded language, defendant J. LOPEZ told a Wilmas gang member that an unidentified co-conspirator was collecting narcotics proceeds and that the Wilmas gang member should also be collecting proceeds.

Overt Act No. 77:   On June 19, 2013, by text message using coded language, a Wilmas gang member told defendant J. LOPEZ that he had $600 and approximately 23 grams of methamphetamine remaining.

Overt Act No. 78:   On June 20, 2013, by telephone using coded language, a Wilmas gang member told defendant J. LOPEZ to be careful, because there was a heavy police presence in the neighborhood.

Overt Act No. 79:   On June 20, 2013, by telephone using coded language, a Wilmas gang member asked defendant J. LOPEZ to "front" one ounce of methamphetamine, and defendant J. LOPEZ told the Wilmas gang member that they would discuss it in person.

Overt Act No. 80:   On June 22, 2013, by telephone using coded language, a co-conspirator told defendant J. LOPEZ that he had only four ounces of methamphetamine at that time, but that the co-conspirator was expecting his suppliers to deliver additional methamphetamine.

Overt Act No. 81:   On June 23, 2013, by telephone using coded language, defendant J. LOPEZ told an incarcerated Wilmas gang member

that defendant J. LOPEZ would smuggle narcotics to him at the Pleasant Valley State Prison.

Overt Act No. 82:   On June 24, 2013, by text messages using coded language, defendant J. LOPEZ asked defendant SANCHEZ if defendant SANCHEZ had paid the "balance" he owed to another Wilmas gang member, and defendant SANCHEZ said that he would pay the Wilmas gang member that night, when defendant SANCHEZ picked up additional methamphetamine.

Overt Act No. 83:   On June 24, 2013, by text message using coded language, a Wilmas gang member asked defendant J. LOPEZ to provide one half-ounce of methamphetamine to him.

Overt Act No. 84:   On June 25, 2013, by text messages using coded language, a Wilmas gang member asked defendant J. LOPEZ if J. LOPEZ had methamphetamine available, and defendant J. LOPEZ told the Wilmas gang member to come to J. LOPEZ' residence.

Overt Act No. 85:   On June 25, 2013, by telephone using coded language, an incarcerated Wilmas gang member asked defendant J. LOPEZ to identify the type of narcotics defendant J. LOPEZ would smuggle into the Pleasant Valley State Prison, and defendant J. LOPEZ said that he did not want to identify the narcotics over the telephone, but that he knew how to do it.

Overt Act No. 86:   On June 26, 2013, by text messages using coded language, defendant J. LOPEZ agreed to sell one half-ounce of methamphetamine to an unidentified co-conspirator.

Overt Act No. 87:   On June 26, 2013, by text messages using coded language, defendant J. LOPEZ agreed to sell one quarter-ounce of methamphetamine to another Wilmas gang member for $110.

1      <u>Overt Act No. 88:</u>  On July 3, 2013, by telephone using coded
2  language, a Wilmas gang member told defendant J. LOPEZ that he still
3  had "dope," and defendant J. LOPEZ admonished the gang member to "say
4  it a little louder on the mother*cking phone, you dumb mother*cker!"

5      <u>Overt Act No. 89:</u>  On July 4, 2013, by text message using coded
6  language, a Wilmas gang member told defendant J. LOPEZ that the most
7  recent batch of methamphetamine that defendant J. LOPEZ had provided
8  was 60 grams "short" from the agreed-upon amount.

9      <u>Overt Act No. 90:</u>  On July 9, 2013, by telephone using coded
10  language, a Wilmas gang member told defendant J. LOPEZ that defendant
11  A. SORIANO was attempting to "tax" him, and that defendant L. KELLY
12  wanted to meet in person with the Wilmas gang member to collect the
13  "tax" payment.

14      <u>Overt Act No. 91:</u>  On July 9, 2013, by telephone using coded
15  language, a Wilmas gang member told defendant J. LOPEZ that defendant
16  L. KELLY had called him to "tax" him, and the Wilmas gang member
17  complained that defendant J. LOPEZ was not "looking out" for him.

18      <u>Overt Act No. 92:</u>  On July 9, 2013, by telephone using coded
19  language, an incarcerated Wilmas gang member told defendant J. LOPEZ
20  that he would have to pay a Villa Boys gang member "'Capone' from
21  Pasadena," for authorization to sell narcotics and collect "taxes,"
22  and that defendant J. LOPEZ would then be "covered" by Mexican Mafia
23  Member #1 or Mexican Mafia Member #2, who had authority over Wilmas
24  gang territory; and defendant J. LOPEZ said that he was being
25  questioned by defendant L. KELLY and asked the incarcerated Wilmas
26  gang member to contact "Capone" quickly on defendant J. LOPEZ'
27  behalf.

28

Overt Act No. 93:   On July 9, 2013, by telephone using coded language, an incarcerated Wilmas gang member told defendant J. LOPEZ that the incarcerated member had "texted" and was sending money to the Mexican Mafia representative in Pasadena for defendant J. LOPEZ and identified the address for him on Flower Street.

Overt Act No. 94:   On July 9, 2013, by telephone using coded language, defendant J. LOPEZ told an incarcerated Wilmas gang member that defendant J. LOPEZ would be meeting with the Mexican Mafia representative in Pasadena that night in order to address the payment of "taxes" by J. LOPEZ, and J. LOPEZ said that he paid "taxes" to multiple Mexican Mafia gang members, "not just one," including Mexican Mafia members incarcerated in the California State Prison at Corcoran, California.

Overt Act No. 95:   On July 9, 2013, by telephone using coded language, an incarcerated Wilmas gang member provided defendant J. LOPEZ with contact information for an inmate in the California State Prison in Pelican Bay, California, and offered to contact a Mexican Mafia member who was out of prison, to assist defendant J. LOPEZ with "taxes" defendant J. LOPEZ was required to pay to the Mexican Mafia.

Overt Act No. 96:   On July 11, 2013, by telephone using coded language, defendant J. LOPEZ and another Wilmas gang member discussed several individuals who owed them money for drug debts, including defendant SANCHEZ, and how they should collect the money.

Overt Act No. 97:   On July 12, 2013, by telephone using coded language, defendant J. LOPEZ told an unindicted co-conspirator that she should sell methamphetamine for between $550 and $600 per ounce.

Overt Act No. 98:   On July 13, 2013, by text messages using coded language, defendant SANCHEZ asked defendant J. LOPEZ to call

him as soon as possible, because there were three police vehicles parked at another Wilmas gang member's residence, and defendant J. LOPEZ told defendant SANCHEZ not to worry because the police were actually responding to an incident across the street from the residence.

Overt Act No. 99:  On July 16, 2013, by telephone using coded language, defendant J. LOPEZ asked a co-conspirator if he would meet in order to prepare methamphetamine for distribution.

Overt Act No. 100:  On August 1, 2013, by telephone using coded language, a Wilmas gang member agreed to drive with defendant J. LOPEZ to conduct a methamphetamine transaction.

Overt Act No. 101:  On August 1, 2013, by telephone using coded language, a Wilmas gang member arranged to obtain methamphetamine from defendant J. LOPEZ.

Overt Act No. 102:  On August 17, 2013, by text messages and telephone using coded language, defendant J. LOPEZ used a Wilmas gang member's telephone to sell methamphetamine while that gang member was in custody.

Overt Act No. 103:  On September 9, 2013, Mexican Mafia Member #3 met with another Mexican Mafia leader and a confidential government informant at the El Compadre restaurant on Sunset Boulevard in Los Angeles, California and told the informant that Mexican Mafia Member #3 had just been released from prison after serving 23 years for bank robbery and had spoken to other Mexican Mafia leaders about control over the neighborhoods by the Mexican Mafia and that he was willing to accept control over the city of Gardena and grateful to Mexican Mafia Member #1 for giving him that authority, and Mexican Mafia Member #3 said that he was also aware

that "Capone" from Pasadena had been collecting "taxes" in Gardena under authority from a Mexican Mafia member in Pelican Bay State Prison, but that another Mexican Mafia member had also told Mexican Mafia Member #3 that "Capone" would not be permitted to collect "taxes" from the "homies" in the harbor area.

Overt Act No. 104:  On September 13, 2013, by telephone using coded language, defendants A. SORIANO and D. HERNANDEZ negotiated with an unindicted co-conspirator to purchase highly pure methamphetamine from Sinaloa, Mexico, and defendant D. HERNANDEZ told defendant A. SORIANO that the methamphetamine was "way better than what" defendant L. KELLY had and that there was "no cut in it."

Overt Act No. 105:  On September 13, 2013, by telephone using coded language, defendant A. SORIANO told defendant D. HERNANDEZ that he wanted to speak with defendant L. KELLY before meeting the Sinaloan methamphetamine supplier, because defendant L. KELLY might want to either participate or might question the risk of changing from their established sources of supply; and defendant A. SORIANO also stated that he wanted to introduce the Sinaloa source of supply to Mexican Mafia member #3.

Overt Act No. 106:  On September 14, 2013, by telephone using coded language, defendant A. SORIANO told an unidentified co-conspirator to ask her friend if she wanted to purchase narcotics because defendant A. SORIANO needed money.

Overt Act No. 107:  On September 14, 2013, using coded language, defendant A. SORIANO told defendant D. HERNANDEZ to bring defendant A. SORIANO the narcotics that were located in the middle of defendant D. HERNANDEZ' car, and defendant D. HERNANDEZ agreed.

1    Overt Act No. 108:  On September 14, 2013, by telephone using

2  coded language, Mexican Mafia member #3 told defendant A. SORIANO

3  that Mexican Mafia Member #3 had been "trying to get that

4  motherf*cker in San Pedro" and asked if defendant A. SORIANO was "in"

5  for the "mission," and Mexican Mafia Member #3 directed defendant A.

6  SORIANO to contact defendant L. KELLY, if defendant A. SORIANO had

7  any questions.

8    Overt Act No. 109:  On September 15, 2013, by telephone using

9  coded language, defendant GARCIA told defendant A. SORIANO that

10  defendant GARCIA had gone to "handle some business in Long Beach"

11  with an unidentified co-conspirator who was "on a mission," and that

12  defendant GARCIA was looking for S.M.

13    Overt Act No. 110:  On September 15, 2013, by telephone using

14  coded language, defendant A. SORIANO told defendant DELGADO to "get

15  ready," because defendant A. SORIANO had an assignment for him in San

16  Pedro, California and confirmed that it would be done "in broad

17  daylight"; and defendant DELGADO said "okay" and told defendant A.

18  SORIANO to pick defendant DELGADO up.

19    Overt Act No. 111:  On September 15, 2013, by telephone using

20  coded language, defendant A. SORIANO told an unindicted co-

21  conspirator that defendant A. SORIANO needed a "357" handgun and that

22  defendant A. SORIANO had run out of "ammo."

23    Overt Act No. 112:  On September 15, 2013, defendant A. SORIANO

24  shot S.M. in San Pedro, California, and fled from the scene in

25  defendant D. HERNANDEZ' car.

26    Overt Act No. 113:  On September 15, 2013, by telephone using

27  coded language, defendant A. SORIANO told defendant L. KELLY that "it

28

1  was already done," and defendant A. SORIANO confirmed that he had

2  "just done with 'O' boy'" and was leaving San Pedro, California.

3      Overt Act No. 114:  On September 15, 2013, by telephone using

4  coded language, defendant A. SORIANO asked an unindicted co-

5  conspirator to obtain either 9 mm or .380 caliber bullets for

6  defendant A. SORIANO, and defendant A. SORIANO also asked defendant

7  GARCIA to confirm whether an unindicted co-conspirator wanted to

8  purchase an additional quantity of methamphetamine and also told

9  defendant GARCIA that he had already shot S.M.

10      Overt Act No. 115:  On September 15, 2013, by telephone using

11  coded language, defendant A. SORIANO described the shooting of S.M.

12  to an unindicted co-conspirator by saying that defendant A. SORIANO

13  "already took care of that dude, so that was a wrap with that sh*t."

14      Overt Act No. 116:  On September 15, 2013, by telephone using

15  coded language, defendant A. SORIANO told defendant GARCIA that S.M.

16  had been "smoked out, shot up and everything," and defendant A.

17  SORIANO then directed defendant GARCIA to obtain more ammunition.

18      Overt Act No. 117:  On September 15, 2013, by telephone using

19  coded language, defendant A. SORIANO told an unindicted co-

20  conspirator that he had run out of bullets and asked the unindicted

21  co-conspirator if she could provide him with more 9 mm bullets.

22      Overt Act No. 118:  On September 15, 2013, by telephone using

23  coded language, defendant A. SORIANO asked another unindicted co-

24  conspirator to obtain 9 mm or .380 caliber bullets for him, because

25  defendant A. SORIANO had run out of ammunition.

26      Overt Act No. 119:  On September 15, 2013, by telephone using

27  coded language, defendant A. SORIANO told defendant L. KELLY that

28  another individual had told defendant A. SORIANO that the individual

1   had better quality drugs than did defendants L. KELLY and A. SORIANO,

2   and that the individual would sell it in defendant A. SORIANO's

3   locations.

4      Overt Act No. 120:   On September 15, 2013, by telephone using

5   coded language, defendant L. KELLY said that defendant A. SORIANO

6   should order another member of the organization to assault the

7   individual making the challenge to their organization's control of

8   its drug locations.

9      Overt Act No. 121:   On September 16, 2013, by telephone using

10  coded language, defendant A. SORIANO asked defendant GARCIA if

11  defendant GARCIA had heard anything about S.M. being "hit," because

12  defendant A. SORIANO was "sure he got that n*gga"; and defendant A.

13  SORIANO also asked if the co-conspirator knew anyone who had more 9

14  mm bullets.

15     Overt Act No. 122:   On September 16, 2013, by telephone using

16  coded language, defendant A. SORIANO agreed to deliver narcotics to

17  defendant DELGADO instead of delivering money to defendant DELGADO.

18     Overt Act No. 123:   On September 16, 2013, by telephone using

19  coded language, defendant WOODRUFF told defendant A. SORIANO that he

20  had identified the location of a confidential government witness who

21  would testify against a Wilmas gang member who was charged with

22  murder, and defendant A. SORIANO directed defendant WOODRUFF to wait

23  and meet with defendant A. SORIANO in person.

24     Overt Act No. 124:   On September 16, 2013, by telephone using

25  coded language, defendant A. SORIANO told defendant L. KELLY that A.

26  SORIANO had located "the snitch" who would testify against a Wilmas

27  gang member who was charged with murder, and defendant L. KELLY

28

directed defendant A. SORIANO to meet with defendant L. KELLY in person.

Overt Act No. 125:  On September 16, 2013, defendants A. SORIANO and WOODRUFF arrived at the motel where a confidential government witness had been residing and waited until law enforcement officers removed the witness from the location.

Overt Act No. 126:  On September 16, 2013, by telephone using coded language, defendants A. SORIANO and L. KELLY agreed to meet to discuss the confidential government witness.

Overt Act No. 127:  On September 17, 2013, by text message using coded language, defendant A. SORIANO told defendant GARCIA that defendant A. SORIANO would supply an unidentified co-conspirator with nine grams of methamphetamine, and defendant GARCIA told defendant A. SORIANO to "hold" one ounce for the unindicted co-conspirator.

Overt Act No. 128:  On September 17, 2013, by telephone using coded language, defendant DELGADO asked defendant A. SORIANO to provide defendant DELGADO with narcotics for distribution.

Overt Act No. 129:  On September 17, 2013, by telephone using coded language, a Wilmas gang member agreed to contact defendant J. LOPEZ for methamphetamine to provide to defendant A. SORIANO.

Overt Act No. 130:  On September 18, 2013, by telephone using coded language, defendant A. SORIANO told defendant GARCIA that defendant A. SORIANO had held a gun in each hand when he shot S.M., who was not armed, and that he believed he had killed S.M.; but defendant GARCIA told defendant A. SORIANO that S.M. had only been hit "in the ass," and defendant GARCIA also told defendant A. SORIANO that an unindicted co-conspirator would buy more narcotics from defendant A. SORIANO soon.

1    <u>Overt Act No. 131:</u>  On September 18, 2013, by telephone using

2    coded language, defendant A. SORIANO told defendant L. KELLY that

3    S.M. was in the hospital after having been shot in two places.

4    <u>Overt Act No. 132:</u>  On September 18, 2013, by telephone using

5    coded language, defendant WOODRUFF told defendant A. SORIANO that he

6    had been in an altercation with a rival gang member who had showed

7    his "colors" and wanted to "cut him up," and defendant A. SORIANO

8    asked defendant WOODRUFF if he needed any "work" and how much he was

9    paying for one ounce of methamphetamine; and defendant WOODRUFF

10   replied that defendant A. SORIANO should know since defendant A.

11   SORIANO was his source of supply.

12   <u>Overt Act No. 133:</u>  On September 18, 2013, by telephone using

13   coded language, defendant A. SORIANO told defendant WOODRUFF that

14   defendant A. SORIANO had narcotics to supply.

15   <u>Overt Act No. 134:</u>  On September 18, 2013, by telephone using

16   coded language, defendant A. SORIANO arranged to obtain bullets from

17   an unidentified co-conspirator and agreed to sell narcotics to the

18   unidentified co-conspirator.

19   <u>Overt Act No. 135:</u>  On September 18, 2013, by telephone using

20   coded language, defendant A. SORIANO told defendant WOODRUFF that he

21   needed defendant WOODRUFF's help to "move this work" and arranged to

22   sell one ounce of methamphetamine to defendant WOODRUFF.

23   <u>Overt Act No. 136:</u>  On September 18, 2013, by telephone using

24   coded language, defendant A. SORIANO told defendant L. KELLY that a

25   Wilmas gang member and an unindicted co-conspirator had asked how

26   much they would have to pay in order to be permitted sell drugs in

27   Wilmas gang territory, and defendant L. KELLY said to charge them

28   $200 and asked which of them would be responsible for paying the tax

going forward, to which defendant A. SORIANO answered that it would be the Wilmas gang member.

Overt Act No. 137: On September 18, 2013, by telephone using coded language, defendant A. SORIANO told an unidentified co-conspirator that he had obtained one ounce of methamphetamine from a Wilmas gang member for $350.

Overt Act No. 138: On September 18, 2013, by telephone using coded language, defendant A. SORIANO told another Wilmas gang member that defendant A. SORIANO was going to put him in touch with defendant L. KELLY because defendant L. KELLY wanted to talk to him.

Overt Act No. 139: On September 18, 2013, by telephone using coded language, defendant A. SORIANO told an unidentified co-conspirator that he was waiting for another Wilmas gang member to drop off drugs and that the Wilmas gang member was giving him a "great deal."

Overt Act No. 140: On September 18, 2013, by telephone using coded language, a Wilmas gang member agreed to sell one and a half ounces of methamphetamine to defendants A. SORIANO and P. SORIANO.

Overt Act No. 141: On September 18, 2013, by telephone using coded language, a Wilmas gang member asked defendant A. SORIANO if he still needed one ounce of methamphetamine, and defendant A. SORIANO said he was willing to pay between $350 and $400 for the methamphetamine as long as the Wilmas gang member was not obtaining the methamphetamine from another Wilmas gang member.

Overt Act No. 142: On September 18, 2013, by telephone using coded language, defendant L. KELLY told another Wilmas gang member that it would cost $50 a month each for him and a female associate to sell drugs in the neighborhood controlled by the Wilmas gang and that

it would be $100 a month for a third person to do so, and defendant L. KELLY ordered the other Wilmas gang member to be the one responsible each month for getting the payments to defendant L. KELLY.

Overt Act No. 143:  On September 18, 2013, by telephone using coded language, a Wilmas gang member told defendant A. SORIANO that he had collected $50 in "taxes" from an associate and that he would deliver the money to defendant A. SORIANO when defendant A. SORIANO was in the "hood."

Overt Act No. 144:  On September 18, 2013, by telephone using coded language, defendant A. SORIANO warned defendant L. KELLY about federal law enforcement vehicles in Wilmas gang territory, and defendant L. KELLY ordered defendant A. SORIANO to follow the law enforcement vehicles to see where they were going and advise defendant L. KELLY because defendant L. KELLY was in the middle of selling drugs.

Overt Act No. 145:  On September 18, 2013, by telephone using coded language, defendant A. SORIANO agreed to sell one half-ounce of methamphetamine to a Wilmas gang member for $230.

Overt Act No. 146:  On September 18, 2013, by telephone using coded language, defendant D. HERNANDEZ arranged for defendant A. SORIANO to deliver methamphetamine to defendant D. HERNANDEZ' customer.

Overt Act No. 147:  On September 18, 2013, by telephone using coded language, an unidentified co-conspirator asked to purchase a half-ounce of methamphetamine from defendant J. LOPEZ, and the two agreed on a place to meet for the transaction.

Overt Act No. 148:  On September 18, 2013, by telephone using coded language, defendant A. SORIANO told defendant WOODRUFF that they needed to meet, because a witness had testified to being assaulted by defendants A. SORIANO and WOODRUFF.

Overt Act No. 149:  On September 18, 2013, by telephone using coded language, defendant A. SORIANO told defendant WOODRUFF that he believed a female associate was "all bad" for providing information to law enforcement that led to defendant A. SORIANO being discussed in a murder prosecution.

Overt Act No. 150:  On September 18, 2013, by telephone using text messages, defendant A. SORIANO told defendant L. KELLY that a "snitch" had said defendant A. SORIANO's name and testified that defendant A. SORIANO had been ordered to assault the witness.

Overt Act No. 151:  On September 19, 2013, by telephone using coded language, defendant A. SORIANO told a Wilmas gang member to call defendant A. SORIANO first if anyone needed drugs and that defendant A. SORIANO would provide them.

Overt Act No. 152:  On September 19, 2013, by telephone using coded language, an unidentified co-conspirator told defendant A. SORIANO that she would need to ask defendant L. KELLY for permission before selling drugs to defendant A. SORIANO, and defendant A. SORIANO said that defendant L. KELLY would agree because defendant L. KELLY did not "deal with little things."

Overt Act No. 153:  On September 19, 2013, by telephone using coded language, defendant A. SORIANO told defendant L. KELLY that defendant A. SORIANO had just met with Mexican Mafia Member #3 and defendant ORTIGOZA, who said that defendant L. KELLY had paid them for permission to sell drugs within the territory controlled by their

organization, and defendant A. SORIANO also advised defendant L. KELLY that another Wilmas gang member was helping Mexican Mafia Member #3 and defendant ORTIGOZA to distribute drugs.

Overt Act No. 154:  On September 19, 2013, defendants A. SORIANO and D. HERNANDEZ possessed approximately 32.4 grams of methamphetamine, which was concealed inside defendant D. HERNANDEZ' bra while she drove them in a silver Toyota Solara.

Overt Act No. 155:  On September 19, 2013, by telephone using coded language, defendant D. HERNANDEZ told defendant P. SORIANO that law enforcement officers "got" defendants A. SORIANO and D. HERNANDEZ and an unindicted Wilmas gang member after defendant A. SORIANO put the methamphetamine inside her bra and fled from officers with the unindicted Wilmas gang member, that defendant A. SORIANO had asked law enforcement officers to let defendant D. HERNANDEZ go, and that officers knew everything about her and others who "were gang members too."

Overt Act No. 156:  On September 19, 2013, by telephone using coded language, defendant D. HERNANDEZ told an unindicted Wilmas gang member that defendant L. KELLY picked her up from jail, that defendant D. HERNANDEZ had been tasked with getting defendant L. KELLY's firearms back to him so all of defendant A. SORIANO's firearms needed to go back to the person who was collecting them for defendant L. KELLY, and defendant D. HERNANDEZ said that she had falsely claimed to officers that she did not know the unindicted Wilmas gang member and ended the conversation by acknowledging her loyalty to the gang by saying, "west."

Overt Act No. 157:  On September 20, 2013, by telephone using coded language, a Wilmas gang member asked defendant J. LOPEZ if

1  defendant J. LOPEZ had any methamphetamine for sale, and defendant J.

2  LOPEZ said he would call him back in 45 minutes.

3   Overt Act No. 158:  On September 20, 2013, by telephone using

4  coded language, defendant D. HERNANDEZ told defendant P. SORIANO that

5  defendant D. HERNANDEZ was with defendant L. KELLY and needed to

6  deliver money that was owed to defendant L. KELLY, because another

7  Wilmas gang member had incorrectly delivered money that defendant A.

8  SORIANO owed to defendant L. KELLY for methamphetamine.

9   Overt Act No. 159:  On September 20, 2013, by telephone using

10  coded language, defendant P. SORIANO asked defendant D. HERNANDEZ to

11  locate a .380 caliber handgun for defendant L. KELLY, who wanted that

12  firearm and another firearm that was possessed by an unindicted co-

13  conspirator and that defendant P. SORIANO had already delivered money

14  to defendant L. KELLY, and defendant D. HERNANDEZ said that she

15  already knew "all the business" and had spoken to L. KELLY.

16   Overt Act No. 160:  On September 20, 2013, by telephone using

17  coded language, a Wilmas gang member told defendant D. HERNANDEZ that

18  the Wilmas gang member and others were in a "scavenger hunt" to

19  search for missing firearms.

20   Overt Act No. 161:  On September 20, 2013, by telephone using

21  coded language, defendant D. HERNANDEZ told defendant P. SORIANO that

22  defendant L. KELLY charged her too much for methamphetamine, that she

23  was on her way to Wilmington and could deliver narcotics, but that

24  she did not have a scale, and defendant P. SORIANO told defendant D.

25  HERNANDEZ that he had a scale to weigh narcotics.

26   Overt Act No. 162:  On September 21, 2013, by telephone using

27  coded language, defendant GARCIA told another Wilmas gang member that

28

defendant GARCIA was "in the hood, driving around" and that she "saw some fools" and wanted to attack.

Overt Act No. 163: On September 21, 2013, by telephone using coded language, defendant P. SORIANO told a Wilmas gang member that defendant L. KELLY had directed defendant P. SORIANO to retrieve firearms from them so that the firearms could be disposed of and replaced.

Overt Act No. 164: On September 21, 2013, by telephone using coded language, defendant P. SORIANO asked defendant D. HERNANDEZ if she had been told by defendant L. KELLY that defendant L. KELLY wanted to collect firearms from them, and defendant D. HERNANDEZ told defendant P. SORIANO that she had already known.

Overt Act No. 165: On September 24, 2013, by telephone using coded language, defendant D. HERNANDEZ told Mexican Mafia Member #3 that defendant D. HERNANDEZ was attempting to provide Mexican Mafia Member #3's telephone number to defendant A. SORIANO while defendant A. SORIANO was in custody, and Mexican Mafia Member #3 asked defendant D. HERNANDEZ if defendant A. SORIANO needed money and said that he would give money to defendant D. HERNANDEZ.

Overt Act No. 166: On September 24, 2013, by telephone using coded language, defendant D. HERNANDEZ acknowledged to defendant A. SORIANO that one of the pieces of methamphetamine in her bra belonged to her and the other piece of methamphetamine that law enforcement officers found belonged to defendant A. SORIANO, and she thanked defendant A. SORIANO for taking responsibility for all of the methamphetamine.

Overt Act No. 167: On September 24, 2013, by telephone using coded language, defendant D. HERNANDEZ told defendant A. SORIANO that

44

she was selling drugs, and said that she had met with defendant L. KELLY, who had provided her with a half-ounce of methamphetamine.

Overt Act No. 168:   On September 24, 2013, by telephone using coded language, defendant A. SORIANO instructed defendant D. HERNANDEZ to call his drug customers and tell them that she was selling drugs now that A. SORIANO was incarcerated, and defendant A. SORIANO encouraged defendant D. HERNANDEZ to continue selling drugs and to "expand" their drug business.

Overt Act No. 169:   On or about September 24, 2013, by telephone using coded language, defendant D. HERNANDEZ responded by telling defendant A. SORIANO to trust her because she knew what she was doing.

Overt Act No. 170:   On or about September 25, 2013, by telephone using coded language, defendant D. HERNANDEZ told an unidentified co-conspirator that defendant A. SORIANO wanted everyone to know that they could call defendant D. HERNANDEZ if they wanted to purchase drugs.

Overt Act No. 171:   On September 25, 2013, by telephone using coded language, defendant A. SORIANO instructed defendant D. HERNANDEZ to obtain a firearm from defendant L. KELLY to give to another member of their organization whom defendant D. HERNANDEZ should have accompany her for her protection while selling drugs, and defendant D. HERNANDEZ said that she had "permission" to sell drugs.

Overt Act No. 172:   On September 25, 2013, by telephone using coded language, defendant D. HERNANDEZ told defendant P. SORIANO that defendant D. HERNANDEZ had advised another Wilmas gang member that he was "stupid for being over there with the n*ggers" without carrying a weapon.

Overt Act No. 173:  On or about September 26, 2013, by telephone using coded language, an unindicted co-conspirator told defendant A. SORIANO that the unindicted co-conspirator had paid defendant L. KELLY $400 to clear defendant A. SORIANO's "debt" for the methamphetamine seized on September 19, 2013.

Overt Act No. 174:  On or about September 26, 2013, by telephone using coded language, defendant D. HERNANDEZ advised defendant A. SORIANO that she was using a new source of supply of methamphetamine, and that her customers preferred it to the methamphetamine supplied by defendant L. KELLY, and were willing to pay more money for it.

Overt Act No. 175:  On or about September 26, 2013, by telephone using coded language, defendant P. SORIANO advised defendant A. SORIANO that P. SORIANO had paid defendant L. KELLY the money that defendant A. SORIANO owed to defendant L. KELLY for the methamphetamine seized on September 19, 2013, which had been provided by defendant L. KELLY.

Overt Act No. 176:  On October 24, 2013, by text message using coded language, Mexican Mafia Member #3 advised defendant ORTIGOZA that an unidentified co-conspirator had delivered money for defendant ORTIGOZA.

Overt Act No. 177:  On October 24, 2013, Mexican Mafia Member #3 met with a confidential government informant at the El Compadre restaurant on Sunset Boulevard in Los Angeles, California and told the informant that one of his co-conspirators had not been collecting "taxes" properly in the areas controlled by Mexican Mafia Member #3, that "Capone" and another Mexican Mafia representatives had been more effective in collecting "taxes" in those areas, but that "Capone" had

1  been arrested and charged with murder; and Mexican Mafia Member #3

2  stated that he wanted to take over the harbor area.

3      Overt Act No. 178:  On October 25, 2013, by text message using

4  coded language, Mexican Mafia Member #3 asked defendant ORTIGOZA to

5  identify the person who had been discussing Mexican Mafia Member #3

6  with another Mexican Mafia member.

7      Overt Act No. 179:  On October 25, 2013, by text message using

8  coded language, a Wilmas gang member agreed to supply Mexican Mafia

9  Member #3 with six ounces of methamphetamine.

10      Overt Act No. 180:  On October 26, 2013, by text message using

11  coded language, a Wilmas gang member informed Mexican Mafia Member #3

12  that the six ounces of methamphetamine that he had ordered was ready

13  for pick-up.

14      Overt Act No. 181:  On October 26, 2013, by telephone using

15  coded language, a Wilmas gang member asked Mexican Mafia Member #3

16  how he wanted the six ounces of methamphetamine to be packaged, and

17  Mexican Mafia Member #3 asked for it to be separated into two three-

18  ounce packages.

19      Overt Act No. 182:  On October 27, 2013, by telephone using

20  coded language, defendant ORTIGOZA told Mexican Mafia Member #3 that

21  he had not yet collected "taxes" from defendant SANCHEZ but was still

22  willing to provide defendant SANCHEZ with narcotics, if Mexican Mafia

23  Member #3 approved; and Mexican Mafia Member #3 agreed and told

24  defendant ORTIGOZA that he was concerned about another Mexican Mafia

25  member receiving negative information from his wife, and Mexican

26  Mafia Member #3 also said, "We gotta get our motherf*cking money."

27      Overt Act No. 183:  On October 28, 2013, by telephone using

28  coded language, an incarcerated Wilmas gang member called defendant

ORTIGOZA from a Los Angeles County jail and told defendant ORTIGOZA that "they" had money for defendant ORTIGOZA, and defendant ORTIGOZA told the gang member that a "green" had been ordered and another inmate was to be "stomped out."

Overt Act No. 184:  On October 28, 2013, by telephone using coded language, defendant ORTIGOZA directed an incarcerated Wilmas gang member to "get" an additional inmate as well and that the "greenlight" would be authorized by Mexican Mafia Member #3.

Overt Act No. 185:  On October 28, 2013, by telephone using coded language, Mexican Mafia Member #3 told an unindicted co-conspirator that he and defendant ORTIGOZA had provided one ounce of narcotics to another unindicted co-conspirator who wanted to "work," but the payment had not been delivered.

Overt Act No. 186:  On October 28, 2013, by text message using coded language, defendant ORTIGOZA received a text message from defendant SANCHEZ which stated that defendant SANCHEZ would be late with the payment to defendant ORTIGOZA and Mexican Mafia Member #3, but would have payment with the monthly "tax" payment.

Overt Act No. 187:  On October 28, 2013, by text message using coded language, Mexican Mafia Member #3 told defendant ORTIGOZA that the persons who owed taxes were getting "out of line with excuses" and needed a "wake up call."

Overt Act No. 188:  On October 29, 2013, by telephone using coded language, Mexican Mafia Member #3 arranged to meet with defendant ORTIGOZA and another Wilmas gang leader at the Casa Perez restaurant in Long Beach, California.

Overt Act No. 189:  On October 31, 2013, by text message using coded language, Mexican Mafia Member #3 told defendant ORTIGOZA that

an unidentified female had narcotics for them to retrieve, and defendant ORTIGOZA told Mexican Mafia Member #3 that defendant SANCHEZ was attempting to collect tax and narcotics proceeds for them.

Overt Act No. 190: On November 1, 2013, by text message using coded language, Mexican Mafia Member #3 told defendant ORTIGOZA that he was expecting a telephone call from another Mexican Mafia member.

Overt Act No. 191: On November 3, 2013, by telephone using coded language, defendant ORTIGOZA told Mexican Mafia Member #3 that defendant S. RODRIGUEZ would cover debts owed by defendant SANCHEZ after defendant SANCHEZ' arrest.

Overt Act No. 192: On November 4, 2013, by telephone using coded language, Mexican Mafia member #3 told defendant ORTIGOZA that Mexican Mafia Member #3 would deliver five ounces of methamphetamine to defendant ORTIGOZA's niece for defendant ORTIGOZA to distribute.

Overt Act No. 193: On November 4, 2013, by text message using coded language, defendant ORTIGOZA advised Mexican Mafia Member #3 that defendant S. RODRIGUEZ would pay "bits at a time" for money owed by defendant SANCHEZ.

Overt Act No. 194: On November 4, 2013, by telephone using coded language, a Wilmas gang leader told Mexican Mafia Member #3 that the leader's brother was incarcerated with a Mexican Mafia member and wanted to send "regards" to Mexican Mafia Member #3, and the Wilmas gang leader also told Mexican Mafia Member #3 that "Live Scan" was a program used by federal law enforcement, but that it had not been used on him when he was "out on the streets."

Overt Act No. 195: On November 7, 2013, by telephone using coded language, Mexican Mafia Member #3 told a Wilmas gang leader

that Mexican Mafia Member #3 had been attempting to meet with defendants L. KELLY and ORTIGOZA and another unindicted Wilmas gang member, and the Wilmas gang leader told Mexican Mafia Member #3 that he was going to make a delivery and that his cousin had been sentenced to 115 months to life in prison.

Overt Act No. 196:  On November 7, 2013, by telephone using coded language, Mexican Mafia Member #3 told a Wilmas gang leader that he had met with another unindicted Wilmas gang member, and the Wilmas gang leader told Mexican Mafia Member #3 that he had identified a law enforcement surveillance camera in the area and discussed plans for a meeting that night.

Overt Act No. 197:  On November 9, 2013, by text message using coded language, defendant ORTIGOZA advised Mexican Mafia Member #3 that defendant ORTIGOZA had been collecting money and defendant SANCHEZ' girlfriend had become frightened, started carrying a gun, and moved to Norwalk.

Overt Act No. 198:  On November 18, 2013, by telephone using coded language, Mexican Mafia Member #3 ordered six ounces of methamphetamine from another Wilmas gang member.

Overt Act No. 199:  On November 18, 2013, by telephone using coded language, Mexican Mafia Member #3 informed a Wilmas gang member that he was on the street in front of his residence, waiting to pick up the six ounces of methamphetamine.

Overt Act No. 200:  On November 19, 2013, by telephone using coded language, a Wilmas gang leader told Mexican Mafia Member #3 that he had obtained his license and could do his "rounds" for Mexican Mafia Member #3 and that the Wilmas gang leader and another unindicted co-conspirator had taxes to deliver.

Overt Act No. 201:  On November 22, 2013, by telephone using coded language, Mexican Mafia Member #3 told defendant ORTIGOZA that Mexican Mafia Member #3's Probation Officer had just left and that defendant S. RODRIGUEZ had delivered money for defendant SANCHEZ, but that defendant SANCHEZ still owed money to another Wilmas gang leader; and defendant ORTIGOZA told Mexican Mafia Member #3 that he had told defendant S. RODRIGUEZ that she still owed $500, but that he was going to tell her that she actually owed $600.

Overt Act No. 202:  On November 22, 2013, by telephone using coded language, a Wilmas gang leader told Mexican Mafia Member #3 that he had money to deliver to Mexican Mafia Member #3, and Mexican Mafia Member #3 told him that Mexican Mafia Member #3 had spoken to an unindicted "East-Side" gang member about a dispute within the organization and asked if the Wilmas gang leader wanted to "get at" a Mexican Mafia member in order to address the conflict.

Overt Act No. 203:  On December 6, 2013, defendant GARCIA possessed methamphetamine and a glass pipe on Avalon Boulevard in Carson, California.

Overt Act No. 204:  On February 10, 2014, defendant TAVAREZ sold 55.7 grams of methamphetamine to a confidential government informant at an automotive shop in Wilmington, California.

Overt Act No. 205:  On March 12, 2014, by telephone using coded language, defendant J. LOPEZ told a confidential government informant that defendant J. LOPEZ used two different telephones in order to avoid getting "caught" by law enforcement, and defendant J. LOPEZ asked to meet with the informant to discuss the collection of "taxes" for the Mexican Mafia.

Overt Act No. 206:  On March 13, 2014, by telephone using text messages, defendant J. LOPEZ arranged to meet with a confidential government informant at the Coco's restaurant on Lake Avenue in Pasadena, California, in order to discuss arrangements for the collection of "taxes" owed to the Mexican Mafia.

Overt Act No. 207:  On March 17, 2014, defendant J. LOPEZ met with a confidential government informant at the Coco's restaurant on Lake Avenue, in Pasadena, California and told the informant that defendant J. LOPEZ was from "Eastside Wilmas" and loyal to Mexican Mafia Member #1, that defendant J. LOPEZ would not let defendant Mexican Mafia Member #3 seize control over his neighborhood; and defendant J. LOPEZ delivered approximately $2,300.00, which defendant J. LOPEZ said he had collected from Long Beach, Wilmington, Torrance, Carson, and Pasadena, and stated that he planned to arrange for a Post Office Box to collect funds for incarcerated Mexican Mafia members and would prepare a list of his collections to give to the informant.

Overt Act No. 208:  On April 14, 2014, Mexican Mafia Member #1 sent magazines, letters and a postcard which contained hidden and coded "kites" to "Jennifer Leslie," at a Post Office Box on McBean Parkway in Santa Clarita, California.

Overt Act No. 209:  On April 29, 2014, defendant J. LOPEZ used the name "Samantha" and sent money orders addressed to "Jennifer Leslie," at a Post Office Box on McBean Parkway in Santa Clarita, California, as "tax" payments for Mexican Mafia Member #1.

Overt Act No. 210:  On May 26, 2014, defendant GARCIA possessed methamphetamine, which she had hidden in her vagina, while driving a stolen car in Wilmington, California.

1    Overt Act No. 211:  On May 29, 2014, defendant J. LOPEZ
2   delivered "tax" payments for Mexican Mafia Member #1 by addressing
3   the payments to "Jennifer Leslie" at a Post Office Box on McBean
4   Parkway in Santa Clarita, California.

5    Overt Act No. 212:  On June 5, 2014, defendant GARCIA possessed
6   approximately 2 grams of methamphetamine, which she had hidden in her
7   bra, at a hotel in Wilmington, California.

8    Overt Act No. 213:  On December 5, 2015, defendant GARCIA
9   possessed methamphetamine, which she had hidden in her bra, while
10  driving a Dodge Magnum in Wilmington, California.

11   Overt Act No. 214:  On July 11, 2016, Mexican Mafia Member #3
12  told incarcerated gang members that he had been informed by another
13  Wilmas gang leader and had "read the paperwork" on an inmate who had
14  provided information to law enforcement concerning a Mexican Mafia
15  associate which appeared in an indictment and that Mexican Mafia
16  Member #3 was "trying to take over Long Beach," so Mexican Mafia
17  Member #3 directed the incarcerated gang members to beat the inmate
18  and "fine" him $500 to teach the inmate to "keep his f*cking mouth
19  shut"; and one of the incarcerated inmates told Mexican Mafia Member
20  #3 that a Wilmas gang leader had previously given "a verbal"
21  authorization to attack the suspected informant.

22
23       The Grand Jury Further Alleges That:
24       1.   Beginning on a date unknown and continuing to on or about
25  October 27, 2016, in Los Angeles County, within the Central District
26  of California, and elsewhere, defendants L. KELLY, A. SORIANO,
27  DELGADO, J. LOPEZ, ORTIGOZA, CALDERON, S. RODRIGUEZ, D. HERNANDEZ, P.
28  SORIANO, WOODRUFF, BECERRA, TAVAREZ, E. GUERRERO, GARCIA, and

1   SANCHEZ, and others known and unknown to the Grand Jury, knowingly

2   and intentionally conspired and agreed with each other to distribute

3   at least 50 grams of methamphetamine, a Schedule II controlled

4   substance, in violation of Title 21, United States Code, Sections

5   846, 841(a)(1), and 841(b)(1)(A).

6        2.   On or about January 21, 2013, in Los Angeles County, within

7   the Central District of California, defendant DELGADO did unlawfully,

8   willfully, deliberately and with premeditation kill with malice

9   aforethought E.T., in violation of California Penal Code Sections 31,

10  187, and 189.

11       3.   On or about September 14, 2013, in Los Angeles County,

12  within the Central District of California, defendants L. KELLY, A.

13  SORIANO, and DELGADO unlawfully, willfully, deliberately and with

14  premeditation conspired to kill with malice aforethought S.M., in

15  violation of California Penal Code Sections 31, 182, 187, and 189.

16       4.   On or about September 15, 2013, in Los Angeles County,

17  within the Central District of California, defendant A. SORIANO

18  unlawfully attempted to kill with malice aforethought S.M., in

19  violation of California Penal Code Sections 21a, 31, 187, 189, and

20  664.

21

22

23

24

25

26

27

28

COUNT TWO

[18 U.S.C. § 1962(c)]

1.    Paragraphs One through Twenty of the Introductory Allegations of this First Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

A.    THE RACKETEERING OFFENSE

2.    Beginning on a date unknown and continuing to on or about October 27, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendants L. KELLY, A. SORIANO, DELGADO, J. LOPEZ, D. HERNANDEZ, WOODRUFF, BECERRA, TAVAREZ, and E. GUERRERO, and others known and unknown to the Grand Jury, being persons employed by and associated with the Wilmas criminal enterprise, which was an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise, through a pattern of racketeering activity, that is, through the commission of the acts set forth below.

B.    THE PATTERN OF RACKETEERING ACTIVITY

3.    The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

Racketeering Act One

Conspiracy to Distribute Narcotics

4.   Beginning on a date unknown to the Grand Jury and continuing to on or about October 27, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendants L. KELLY, A. SORIANO, DELGADO, J. LOPEZ, D. HERNANDEZ, WOODRUFF, BECERRA, TAVAREZ, and E. GUERRERO, and others, known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses: to distribute at least 50 grams of actual methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(A)(viii); and to distribute at least 5 grams of actual methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States code, Section 841(a)(1) and 841(b)(1)(B)(viii).

Racketeering Act Two

Extortion

5.   On or about November 3, 2007, in Los Angeles County, within the Central District of California, defendant L. KELLY knowingly and intentionally attempted to extort money from others by means of force or threat of force, in violation of California Penal Code Sections 21a, 518, 519, 520, and 664.

Racketeering Act Three

Distribution of Methamphetamine

    6.  On or about June 6, 2012, in Los Angeles County, within the Central District of California, defendant BECERRA knowingly and intentionally distributed methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Four

Distribution of Methamphetamine

    7.  On or about July 3, 2012, in Los Angeles County, within the Central District of California, defendant BECERRA knowingly and intentionally distributed methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Five

Distribution of Methamphetamine

    8.  On or about September 26, 2012, in Los Angeles County, within the Central District of California, defendant E. GUERRERO knowingly and intentionally distributed methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Six

Murder

9. On or about January 21, 2013, in Los Angeles County, within the Central District of California, defendant DELGADO willfully, deliberately, and with premeditation unlawfully killed with malice aforethought E.T., in violation of California Penal Code Sections 31, 187, and 189.

Racketeering Act Seven

Distribution of Methamphetamine

10. On or about February 12, 2013, in Los Angeles County, within the Central District of California, defendant J. LOPEZ knowingly and intentionally distributed methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Eight

Distribution of Methamphetamine

11. On or about March 12, 2013, in Los Angeles County, within the Central District of California, defendant J. LOPEZ knowingly and intentionally distributed methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Nine

Distribution of Methamphetamine

12. On or about April 15, 2013, in Los Angeles County, within the Central District of California, defendant J. LOPEZ knowingly and intentionally distributed methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Ten

Conspiracy and Attempt to Commit Murder

13. Defendants committed the following acts, any one of which constitutes Racketeering Act Ten:

a. Between on or about September 14, 2013 and September 15, 2013, in Los Angeles County, within the Central District of California, defendants A. SORIANO and DELGADO unlawfully, willfully, and with premeditation conspired to kill with malice aforethought S.M., in violation of California Penal Code Sections 31, 182, 187, and 189.

b. On or about September 15, 2013, in Los Angeles County, within the Central District of California, defendant A. SORIANO willfully, deliberately, and with premeditation attempted to kill with malice aforethought S.M., in violation of California Penal Code Sections 21a, 31, 182, 187, 189, and 664.

Racketeering Act Eleven

Witness Tampering

14.  On or about September 16, 2013, in Los Angeles county, within the Central District of California, defendants L. KELLY, A. SORIANO, and WOODRUFF knowingly attempted to use physical force and the threat of physical force against a witness with the intent to influence, delay, and prevent the testimony of the witness in an official proceeding, and cause the witness to withhold testimony from an official proceeding, appear as a witness and be absent from an official proceeding, and otherwise to hinder, delay, and prevent the communication to a law enforcement officer and judge of the United States of information relating to the commission and possible commission of a federal offense, in violation of Title 18, United States Code, Section 1512(a)(2).

Racketeering Act Twelve

Possession with Intent to Distribute Methamphetamine

15.  On or about September 19, 2013, in Los Angeles County, within the Central District of California, defendants A. SORIANO and D. HERNANDEZ knowingly and intentionally possessed with the intent to distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Thirteen

Distribution of Methamphetamine

16.   On or about February 10, 2014, in Los Angeles County, within the Central District of California, defendant TAVAREZ knowingly and intentionally distributed methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

COUNT THREE

[18 U.S.C. § 1959(a)(1)]

1.   At all times relevant to this First Superseding Indictment, the Wilmas gang, including its "Eastside" and "Westside" members and associates, as described more particularly in paragraphs One through Twenty of the Introductory Allegations, which paragraphs are incorporated and re-alleged herein as if set forth in full, constituted an enterprise as that term is defined in Title 18, United States Code, Section 1959(b)(2), that is a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce.

2.   At all times relevant to this First Superseding Indictment, the Wilmas gang, including through its "Eastside" and "Westside" members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, robbery, and extortion, in violation of the California Penal Code, and the distribution of controlled substances, including methamphetamine, in violation of Title 21, United States code, Sections 841(a)(1), 843(b), and 846.

3.   On or about January 21, 2013, in Los Angeles County, within the Central District of California, and elsewhere, for the purpose of maintaining and increasing position in the Wilmas gang, an enterprise engaged in racketeering activity, defendant DELGADO unlawfully and knowingly murdered E.T., in violation of California Penal Code Sections 31, 187, and 189.

COUNT FOUR

[18 U.S.C. § 1959(a)(5)]

1.    Paragraphs One through Twenty of the Introductory Allegations of this First Superseding Indictment and Paragraphs One and Two of Count Three are hereby incorporated and re-alleged herein as if set forth in full.

2.    On or about September 14 and September 15, 2013, in Los Angeles County, within the Central District of California, and elsewhere, for the purpose of maintaining and increasing position in the Wilmas gang, an enterprise engaged in racketeering activity, defendants A. SORIANO and DELGADO unlawfully and knowingly conspired to murder S.M., in violation of California Penal Code, Sections 31, 182, 187, and 189.

COUNT FIVE

[21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), (b)(1)(B)]

1.     Paragraphs One through Twenty of the Introductory Allegations of this First Superseding Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

A.     OBJECTS OF THE CONSPIRACY

2.     Beginning on a date unknown but no later than on or about August 20, 2012, and continuing to on or about October 27, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendants L. KELLY; A. SORIANO; ADAN RODRIGUEZ, also known as ("aka") "Grizzly" ("A. RODRIGUEZ"); DELGADO; J. LOPEZ; FRANCISCO HERNANDEZ, aka "Pancho" ("F. HERNANDEZ"); ORTIGOZA; ERYANNA NEGRETE, aka "Baby Gangsta," aka "Baby G" ("NEGRETE"); OTONIEL GUERRERO, aka "Twin" ("O. GUERRERO"); RAUL CORNEJO ("CORNEJO"); CALDERON; S. RODRIGUEZ; JOSE HERNANDEZ AGUIAR, aka "Big Joe" ("AGUIAR"); D. HERNANDEZ; P. SORIANO; WOODRUFF; BECERRA; JAVIER REYNOSO, aka "Berto" ("REYNOSO"); GUADALUPE REYES, aka "Oso" ("REYES"); JAVIER FRAUSTO, aka "Candyman" ("JAVIER FRAUSTO"); MIGUEL MACIEL, aka "Goat" ("MACIEL"); JESSICA FRAUSTO, aka "Lil Jess" ("JESSICA FRAUSTO"); TAVAREZ; E. GUERRERO; JUAN CARLOS HERNANDEZ, aka "Negro Trece" ("J.C. HERNANDEZ"); GARCIA; GILBERT LIZALDE, aka "Sniper" ("LIZALDE"); NELSON MARTINEZ, aka "Lil Torch" ("MARTINEZ"); and SANCHEZ, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

        a.     To possess with intent to distribute and distribute at least 50 grams of methamphetamine, a Schedule II controlled

1  substance, in violation of Title 21, United States Code, Sections

2  841(a)(1) and 841(b)(1)(A)(viii); and

3    b.   To possess with intent to distribute and distribute at

4  least five grams of methamphetamine, a Schedule II controlled

5  substance, in violation of Title 21, United States Code, Sections

6  841(a)(1) and 841(b)(1)(B)(viii).

7  B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

8    ACCOMPLISHED

9    3.   The objects of the conspiracy were to be accomplished, in

10  substance, as follows:

11    a.   Leaders of the drug trafficking organization,

12  including Mexican Mafia Member #1, Mexican Mafia Member #2, Mexican

13  Mafia Member #3, and defendants L. KELLY, A. SORIANO, A. RODRIGUEZ,

14  and ORTIGOZA, and others would authorize persons to distribute

15  narcotics within the territory controlled by the organization.

16    b.   Leaders and members of the drug trafficking

17  organization, including Mexican Mafia Member #3, defendants L. KELLY,

18  A. SORIANO, DELGADO, LOPEZ, F. HERNANDEZ, NEGRETE, O. GUERRERO,

19  CORNEJO, S. RODRIGUEZ, AGUIAR, D. HERNANDEZ, WOODRUFF, BECERRA,

20  REYNOSO, REYES, JAVIER FRAUSTO, MACIEL, JESSICA FRAUSTO, TAVAREZ, E.

21  GUERRERO, J. C. HERNANDEZ, GARCIA, LIZALDE, MARTINEZ, and SANCHEZ,

22  and others, would obtain and distribute methamphetamine within the

23  territory controlled by the organization and attempt to expand the

24  territory controlled by the organization and the Mexican Mafia.

25    c.   Leaders of the organization, including Mexican Mafia

26  Member #3 and defendants L. KELLY, A. SORIANO, J. LOPEZ, A.

27  RODRIGUEZ, and ORTIGOZA, would monitor the distribution activity of

28  the members and associates of the organization, collect "taxes,"

1   "fines," and narcotics debts owed to the organization, and enforce

2   the rules and authority of the organization, including discipline

3   against non-compliant members, encroaching rivals, and persons

4   suspected of cooperating with or providing information to law

5   enforcement or the courts about the crimes of the organization.

6         d.   Leaders of the organization, including Mexican Mafia

7   Member #3, defendants L. KELLY, SORIANO, A. RODRIGUEZ, and ORTIGOZA

8   would enforce the authority of the organization, with the

9   participation of members including DELGADO, J. LOPEZ, WOODRUFF,

10   REYNOSO, and GARCIA, by threatening and extorting members of the

11   community, including local businesses, and assaulting and killing

12   rivals and perceived rivals to the organization.

13         e.   Leaders of the organization, including Mexican Mafia

14   Member #3, defendants A. RODRIGUEZ, ORTIGOZA, A. SORIANO, DELGADO,

15   CALDERON, WOODRUFF, REYNOSO, and GARCIA would also enforce authority

16   and protect the organization by identifying and alerting members to

17   the presence of law enforcement in areas the organization might be

18   observed committing offenses, ordering, communicating, and executing

19   "greenlight" attacks on witnesses and informants in order to prevent

20   them, and intimidate others, from cooperating with law enforcement or

21   testifying against members of the organization.

22         f.   Members and leaders of the organization, including

23   defendants L. KELLY, A. SORIANO, S. RODRIGUEZ, P. SORIANO, and

24   TAVAREZ, would also maintain and distribute firearms and ammunition

25   to be used by members and associates of the organization to promote

26   and defend its narcotics distribution in areas controlled by the

27   organization.

28

1           g.    Members and leaders would maintain the status of the

2  organization and its authority to distribute narcotics by collecting

3  and paying tribute to the Mexican Mafia leadership in the form of

4  "taxes," and Mexican Mafia leaders, like Mexican Mafia Member #3,

5  would, in turn, exercise authority over the organization and

6  authorize it to distribute narcotics within territory controlled by

7  the organization.

8  C.    <u>OVERT ACTS</u>

9       4.    In furtherance of the conspiracy, and to accomplish the

10  objects of the conspiracy, on or about the following dates,

11  defendants L. KELLY, A. SORIANO, A. RODRIGUEZ, DELGADO, J. LOPEZ, F.

12  HERNANDEZ, ORTIGOZA, NEGRETE, O. GUERRERO, CORNEJO, CALDERON, S.

13  RODRIGUEZ, AGUIAR, D. HERNANDEZ, P. SORIANO, WOODRUFF, REYES, JAVIER

14  FRAUSTO, MACIEL, JESSICA FRAUSTO, TAVAREZ, E. GUERRERO, J. C.

15  HERNANDEZ, GARCIA, LIZALDE, MARTINEZ, and SANCHEZ, and others, known

16  and unknown to the Grand Jury, committed various overt acts, within

17  the Central District of California, and elsewhere, including, but not

18  limited to, the following:

19    <u>Overt Acts Nos. 1 through 214</u>: Overt Acts numbered 1 through

20  214, set forth in Count One of this First Superseding Indictment are

21  re-alleged and incorporated herein by reference.

22    <u>Overt Act No. 215</u>:  On August 12, 2012, defendant J.C. HERNANDEZ

23  and an unindicted co-conspirator told a confidential government

24  informant that defendant J.C. HERNANDEZ purchased 5 pounds of

25  methamphetamine at a time from suppliers in Nayarit and Jalisco,

26  Mexico, and defendant J.C. HERNANDEZ agreed to sell methamphetamine

27  to the informant and directed the informant to refer to the

28

1   methamphetamine as "rabbit food" or "bird feed," in order to avoid

2   detection by law enforcement.

3       Overt Act No. 216:   On August 14, 2012, defendant J. C.

4   HERNANDEZ sold 27.3 grams of methamphetamine to a confidential

5   government informant in the parking lot of a Goodwill store on

6   Pacific Coast Highway in Wilmington, California.

7       Overt Act No. 217:   On August 16, 2012, an unindicted co-

8   conspirator introduced a confidential government informant to

9   defendant AGUIAR and told the informant that defendant AGUIAR always

10   has methamphetamine, and defendant AGUIAR told the informant that he

11   obtained methamphetamine from Mexico, that he did not "cut" it, and

12   that it "burned" and lasted a long time.

13       Overt Act No. 218:   On August 20 and 21, 2012, by telephone

14   using coded language, defendant NEGRETE agreed to sell one ounce of

15   methamphetamine to a confidential government informant for $650.

16       Overt Act No. 219:   On August 22, 2012, defendant NEGRETE

17   delivered approximately 27.2 grams of methamphetamine to a

18   confidential government informant at a parking lot on Bay View Avenue

19   in Wilmington, California.

20       Overt Act No. 220:   On August 29, 2012, by telephone using coded

21   language, defendant NEGRETE agreed to sell two ounces of

22   methamphetamine to a confidential government informant.

23       Overt Act No. 221:   On August 30, 2012, by telephone using coded

24   language, defendant NEGRETE told a confidential government informant

25   that defendant NEGRETE had the methamphetamine ready for sale.

26       Overt Act No. 222:   On August 30, 2012, defendant NEGRETE sold

27   approximately 53.4 grams of methamphetamine to a confidential

28

government informant for $1,300 in front of a residence on Gulf Avenue in Wilmington, California.

Overt Act No. 223:  On September 11, 2012, by telephone using coded language, defendant AGUIAR arranged to sell two ounces of methamphetamine to a confidential government informant for $1300.

Overt Act No. 224:  On September 12, 2012, defendant AGUIAR sold approximately 55 grams of methamphetamine to a confidential government informant in the parking lot of a McDonald's restaurant on Pacific Coast Highway in Wilmas gang territory.

Overt Act No. 225:  On September 19, 2012, by telephone using coded language, defendant NEGRETE agreed to sell two ounces of methamphetamine to a confidential government informant.

Overt Act No. 226:  On September 26, 2012, by telephone using coded language, defendant NEGRETE used defendant E. GUERRERO's telephone to arrange to sell two ounces of methamphetamine to a confidential government informant.

Overt Act No. 227:  On September 26, 2012, defendants NEGRETE and E. GUERRERO sold approximately 45.0 grams of methamphetamine to a confidential government informant for $1,300 at a residence on Bay View Avenue in Wilmas gang territory.

Overt Act No. 228:  On October 17, 2012, by telephone using coded language, defendant AGUIAR arranged to sell two ounces of methamphetamine to a confidential government informant.

Overt Act No. 229:  On October 18, 2012, defendant AGUIAR sold approximately 55.6 grams of methamphetamine to a confidential government informant.

Overt Act No. 230:  On October 30, 2012, by telephone using coded language, defendant NEGRETE told defendant E. GUERRERO that

1  defendant A. RODRIGUEZ had called her on behalf of defendant L.

2  KELLY, demanding payment for methamphetamine that defendant E.

3  GUERRERO had obtained from defendant L. KELLY before defendant E.

4  GUERRERO became incarcerated, that defendant NEGRETE would pay $1000

5  to defendant L. KELLY, then sell narcotics for defendant L. KELLY to

6  pay the remainder of what defendant E. GUERRERO owed, and defendant

7  E. GUERRERO directed defendant NEGRETE to have defendant L. KELLY

8  deliver "work" to her, rather than going to defendant L. KELLY's

9  residence, and agreed to call defendant L. KELLY to arrange for

10  defendant L. KELLY to supply narcotics to defendant NEGRETE.

11  Overt Act No. 231: On October 30, 2012, by telephone using

12  coded language, defendant NEGRETE told defendant E. GUERRERO that she

13  had $1,300 to pay defendant L. KELLY.

14  Overt Act No. 232: On October 30, 2012, by telephone using

15  coded language, defendant E. GUERRERO told defendant L. KELLY that E.

16  GUERRERO had $1,300 to pay for the methamphetamine he had purchased

17  from defendant L. KELLY and that defendant NEGRETE would sell

18  narcotics for L. KELLY, and defendant L. KELLY told defendant E.

19  GUERRERO that defendant L. KELLY had directed defendant A. RODRIGUEZ

20  to collect the payment from defendant NEGRETE.

21  Overt Act No. 233: On October 30, 2012, by telephone using

22  coded language, defendant NEGRETE told defendant E. GUERRERO that she

23  had no money and only a half-ounce of methamphetamine, and defendant

24  E. GUERRERO told defendant NEGRETE to contact defendant L. KELLY to

25  obtain more methamphetamine.

26  Overt Act No. 234: On October 31, 2012, by telephone using

27  coded language, defendant E. GUERRERO told defendant NEGRETE that she

28  would be arrested if she came to the prison where he was incarcerated

1   and that she should get identification for someone who looked like

2   her.

3        Overt Act No. 235:  On November 2, 2012, by telephone using

4   coded language, defendant NEGRETE agreed to provide methamphetamine

5   to defendant E. GUERRERO while he was incarcerated.

6        Overt Act No. 236:  On November 4, 2012, by telephone using

7   coded language, defendant NEGRETE told defendant E. GUERRERO that

8   defendant L. KELLY was not answering her telephone calls, and

9   defendant E. GUERRERO told defendant NEGRETE how to obtain narcotics

10  from the source.

11       Overt Act No. 237:  On November 4, 2012, by telephone using

12  coded language, defendant NEGRETE told defendant E. GUERRERO that she

13  would use the identification for G.V. when she brought narcotics to

14  defendant E. GUERRERO while he was incarcerated.

15       Overt Act No. 238:  On November 7, 2012, by telephone using

16  coded language, defendant NEGRETE told defendant E. GUERRERO that she

17  had not heard from defendant L. KELLY or another Wilmas gang member,

18  but that defendant NEGRETE had obtained proceeds from narcotics sales

19  and "taxes" that had been paid.

20       Overt Act No. 239:  On November 10, 2012, defendant NEGRETE used

21  G.V.'s identification in order to gain access and attempt to deliver

22  approximately 11.6 grams of methamphetamine to defendant E. GUERRERO

23  at the Pitchess Detention Center in Castaic, California.

24       Overt Act No. 240:  On November 10, 2012, by telephone using

25  coded language, defendant NEGRETE asked an unindicted co-conspirator

26  to provide defendant NEGRETE with identifying information for G.V.,

27  so that defendant NEGRETE could attempt to persuade officers that she

28  was actually G.V., after defendant NEGRETE was arrested for

1    attempting to smuggle methamphetamine to defendant E. GUERRERO,

2    inside the Pitchess Detention Center in Castaic, California.

3        Overt Act No. 241:  On November 12, 2012, by telephone using

4    coded language, defendant E. GUERRERO asked an unindicted co-

5    conspirator to assist in providing bail for defendant NEGRETE after

6    her arrest and to assault another person "in the West way."

7        Overt Act No. 242:  On January 31, 2013, by telephone using

8    coded language, defendant NEGRETE agreed to sell one ounce of

9    methamphetamine to a confidential government informant.

10       Overt Act No. 243:  On February 25 and 26, 2013, by telephone

11   using coded language, defendant JAVIER FRAUSTO arranged to sell one

12   ounce of methamphetamine to a confidential government informant for

13   $725.

14       Overt Act No. 244:  On February 26, 2013, defendant JAVIER

15   FRAUSTO delivered approximately 27.5 grams of methamphetamine to a

16   confidential government informant in the parking lot of Taco Sinaloa

17   restaurant on Anaheim Street in Wilmington, California, while

18   accompanied by three minor children.

19       Overt Act No. 245:  On March 5, 2013, defendant REYNOSO demanded

20   $4,500 to remove a "green light" imposed by Mexican Mafia members

21   against a confidential government informant.

22       Overt Act No. 246:  On March 27, 2013, defendant REYNOSO

23   collected $4,000 from a confidential government informant, which

24   defendant REYNOSO had demanded as payment to remove a "green light"

25   threat to kill another government informant.

26       Overt Act No. 247:  On April 29, 2013, defendant REYNOSO

27   demanded that a confidential government informant pay defendant

28

1  REYNOSO an additional $4,000 to remove a "green light" order against
2  the informant.

3     Overt Act No. 248:  On May 1, 2013, defendant O. GUERRERO
4  attempted to discard approximately 1.35 grams of methamphetamine and
5  a glass pipe as he fled from law enforcement officers in Wilmington,
6  California.

7     Overt Act No. 249:  On May 16, 2013, defendant JESSICA FRAUSTO
8  arranged to sell two ounces of methamphetamine to a confidential
9  government informant for $1,300.

10     Overt Act No. 250:  On May 16, 2013, defendants MACIEL and
11  JESSICA FRAUSTO delivered approximately 55.1 grams of methamphetamine
12  to a confidential government informant for $1,500, at a parking lot
13  in Wilmington, California.

14     Overt Act No. 251:  On June 4, 2013, by telephone using coded
15  language, defendant J. LOPEZ told defendant CORNEJO that there had
16  not been any complaints about the quality of methamphetamine
17  defendant CORNEJO had provided.

18     Overt Act No. 252:  On June 7, 2013, by text message using coded
19  language, defendant MARTINEZ advised defendant J. LOPEZ that
20  defendant MARTINEZ had $200 to pay for one half-ounce of
21  methamphetamine and wanted to purchase a full ounce of
22  methamphetamine from J. LOPEZ that day.

23     Overt Act No. 253:  On June 8, 2013, by text message using coded
24  language, defendant CORNEJO arranged to deliver methamphetamine to
25  defendant J. LOPEZ.

26     Overt Act No. 254:  On June 10, 2013, by text messages using
27  coded language, defendant MARTINEZ arranged to purchase one ounce of
28  methamphetamine from defendant J. LOPEZ for $400, and defendant J.

LOPEZ told defendant MARTINEZ to be careful when coming to defendant J. LOPEZ' residence.

Overt Act No. 255:  On June 11, 2013, defendant J.C. HERNANDEZ sold approximately 56.3 grams of methamphetamine to a confidential government informant for $1,500 in a parking lot in Wilmington, California.

Overt Act No. 256:  On June 12, 2013, by text messages using coded language, defendant SANCHEZ told defendant J. LOPEZ that defendant SANCHEZ had $250 in drug proceeds for defendant J. LOPEZ.

Overt Act No. 257:  On June 13, 2013, by telephone using coded language, defendant F. HERNANDEZ told defendant J. LOPEZ that drug sales were slow but that defendant F. HERNANDEZ had sold almost all of the drugs in his possession and had at least $1,000 in drug proceeds that he would deliver to defendant J. LOPEZ later that day.

Overt Act No. 258:  On June 15, 2013, by telephone using coded language, defendant F. HERNANDEZ told defendant J. LOPEZ that defendant F. HERNANDEZ had drug proceeds to deliver to defendant J. LOPEZ, and defendants J. LOPEZ and F. HERNANDEZ discussed the need to avoid detection by law enforcement.

Overt Act No. 259:  On June 16, 2013, by telephone using coded language, defendant J. LOPEZ asked defendant CORNEJO to deliver methamphetamine to J. LOPEZ' residence.

Overt Act No. 260:  On June 16, 2013, defendant REYNOSO possessed a Smith and Wesson .38 caliber revolver and 164 rounds of ammunition and fired one round into a house on Cedar Street in Bellflower, California.

Overt Act No. 261:  On June 18, 2013, by telephone using coded language, defendant F. HERNANDEZ told defendant J. LOPEZ that

defendant F. HERNANDEZ had needed to dispose of one-and-a-half ounces of methamphetamine to avoid being caught by law enforcement.

Overt Act No. 262:  On June 18, 2013, by telephone using coded language, defendant JESSICA FRAUSTO asked defendant J. LOPEZ if defendant J. LOPEZ had methamphetamine available, and defendant J. LOPEZ told defendant JESSICA FRAUSTO to come to J. LOPEZ' residence, because he did not want to discuss narcotics sales over the telephone.

Overt Act No. 263:  On June 19, 2013, by telephone using coded language, defendant J. LOPEZ agreed to deliver methamphetamine to defendant JESSICA FRAUSTO at defendant J. LOPEZ' residence on Flint Street in Wilmington, California.

Overt Act No. 264:  On June 19, 2013, defendant JESSICA FRAUSTO drove to defendant J. LOPEZ' residence and obtained methamphetamine from defendant J. LOPEZ.

Overt Act No. 265:  On June 19, 2013, defendant JESSICA FRAUSTO sold approximately 56.3 grams of methamphetamine to a confidential government informant for $1,650, at a parking lot in Carson, California.

Overt Act No. 266:  On June 19, 2013, by telephone using coded language, defendant JESSICA FRAUSTO arranged to deliver proceeds from her recent methamphetamine sale to defendant J. LOPEZ at his residence.

Overt Act No. 267:  On June 19, 2013, by text message using coded language, defendant J. LOPEZ told defendant F. HERNANDEZ that an unidentified co-conspirator was collecting narcotics proceeds and that defendant F. HERNANDEZ should also be collecting proceeds.

Overt Act No. 268:  On June 19, 2013, by text message using coded language, defendant F. HERNANDEZ told defendant J. LOPEZ that defendant F. HERNANDEZ had $600 and approximately 23 grams of methamphetamine remaining.

Overt Act No. 269:  On June 20, 2013, by telephone using coded language, defendant MACIEL told defendant J. LOPEZ to be careful, because there was a heavy police presence in the neighborhood.

Overt Act No. 270:  On June 20, 2013, by telephone using coded language, defendant F. HERNANDEZ asked defendant J. LOPEZ to "front" one ounce of methamphetamine, and defendant J. LOPEZ told defendant F. HERNANDEZ that they would discuss it in person.

Overt Act No. 271:  On June 22, 2013, by telephone using coded language, defendant CORNEJO told defendant J. LOPEZ that defendant CORNEJO had only four ounces of methamphetamine at that time, but that defendant CORNEJO was expecting his suppliers to deliver additional methamphetamine.

Overt Act No. 272:  On June 24, 2013, by text message using coded language, defendant MARTINEZ asked defendant J. LOPEZ to provide one half-ounce of methamphetamine for defendant MARTINEZ.

Overt Act No. 273:  On June 25, 2013, by text messages using coded language, defendant MARTINEZ asked defendant J. LOPEZ if defendant J. LOPEZ had methamphetamine available, and defendant J. LOPEZ told defendant MARTINEZ to come to defendant J. LOPEZ' residence.

Overt Act No. 274:  On June 25, 2013, defendant AGUIAR sold approximately 54.9 grams of methamphetamine to a confidential government informant, at a location next to Banning High School in Wilmington, California and while accompanied by a young child.

76

Overt Act No. 275:   On June 26, 2013, by text messages using coded language, defendant J. LOPEZ agreed to sell one quarter-ounce of methamphetamine to defendant MARTINEZ for $110.

Overt Act No. 276:   On July 2, 2013, defendants F. HERNANDEZ and O. GUERRERO sold approximately 109.7 grams of methamphetamine to a confidential government informant for $2,000, at a parking lot in Wilmas gang territory.

Overt Act No. 277:   On July 3, 2013, by telephone using coded language, defendant F. HERNANDEZ told defendant J. LOPEZ that defendant F. HERNANDEZ still had "dope," and defendant J. LOPEZ admonished defendant F. HERNANDEZ to "say it a little louder on the mother*cking phone, you dumb mother*cker!"

Overt Act No. 278:   On July 4, 2013, by text message using coded language, defendant F. HERNANDEZ told defendant J. LOPEZ that the most recent batch of methamphetamine that defendant J. LOPEZ had provided was 60 grams "short" from the agreed-upon amount.

Overt Act No. 279:   On July 9, 2013, by telephone using coded language, defendant F. HERNANDEZ told defendant J. LOPEZ that defendant A. SORIANO was attempting to "tax" defendant F. HERNANDEZ, and that defendant L. KELLY wanted to meet in person with defendant F. HERNANDEZ to collect the "tax" payment.

Overt Act No. 280:   On July 9, 2013, by telephone using coded language, defendant F. HERNANDEZ told defendant J. LOPEZ that defendant L. KELLY had called defendant F. HERNANDEZ to "tax" defendant F. HERNANDEZ, and defendant F. HERNANDEZ complained that defendant J. LOPEZ was not "looking out" for him.

Overt Act No. 281:   On July 9, 2013, by telephone using coded language, defendant F. HERNANDEZ agreed to sell four ounces of

77

methamphetamine to a confidential government informant in exchange
for $2,000, and defendant F. HERNANDEZ told the confidential
government informant that defendant NEGRETE would deliver the
methamphetamine.

Overt Act No. 282:  On July 9, 2013, defendants F. HERNANDEZ and
NEGRETE delivered approximately 111.2 grams of methamphetamine to a
confidential government informant in exchange for $2,000, at a
parking lot in Wilmington, California.

Overt Act No. 283:  On July 11, 2013, by telephone using coded
language, defendants J. LOPEZ and F. HERNANDEZ discussed several
individuals who owed them money for drug debts, including defendant
SANCHEZ, and how they should collect the money.

Overt Act No. 284:  On July 13, 2013, by text messages using
coded language, defendant SANCHEZ asked defendant J. LOPEZ to call
him as soon as possible, because there were three police vehicles
parked at defendant F. HERNANDEZ' residence, and defendant J. LOPEZ
told defendant SANCHEZ not to worry because the police were actually
responding to an incident across the street from defendant F.
HERNANDEZ' residence.

Overt Act No. 285:  On July 16, 2013, by telephone using coded
language, defendant J. LOPEZ asked defendant CORNEJO if defendant
CORNEJO would meet in order to prepare methamphetamine for
distribution.

Overt Act No. 286:  On August 1, 2013, by telephone using coded
language, defendant MACIEL agreed to drive with defendant J. LOPEZ to
conduct a methamphetamine transaction.

1    Overt Act No. 287:  On August 1, 2013, by telephone using coded

2    language, defendant NEGRETE arranged to obtain methamphetamine from

3    defendant J. LOPEZ.

4    Overt Act No. 288:  On August 17, 2013, by text messages and

5    telephone using coded language, defendant J. LOPEZ used defendant F.

6    HERNANDEZ' telephone to sell methamphetamine for defendant F.

7    HERNANDEZ while defendant F. HERNANDEZ was in custody.

8    Overt Act No. 289:  On September 17, 2013, by telephone using

9    coded language, defendant NEGRETE agreed to contact defendant J.

10   LOPEZ for methamphetamine to provide to defendant A. SORIANO.

11   Overt Act No. 290:  On September 18, 2013, by telephone using

12   coded language, defendant LIZALDE agreed to sell one and one-half

13   ounces of methamphetamine to defendants A. SORIANO and P. SORIANO.

14   Overt Act No. 291:  On September 18, 2013, by telephone using

15   coded language, defendant NEGRETE asked defendant A. SORIANO if he

16   still needed one ounce of methamphetamine, and defendant A. SORIANO

17   said he was willing to pay between $350 and $400 for the

18   methamphetamine as long as defendant NEGRETE was not obtaining the

19   methamphetamine from defendant LIZALDE.

20   Overt Act No. 292:  On September 18, 2013, by telephone using

21   coded language, defendant L. KELLY told defendant LIZALDE that it

22   would cost $50 a month each for him and a female associate to sell

23   drugs in the neighborhood and that it would be $100 a month for a

24   third person to do so, and defendant L. KELLY ordered defendant

25   LIZALDE to be the one responsible each month for getting the payments

26   to defendant L. KELLY.

27   Overt Act No. 293:  On September 18, 2013, by telephone using

28   coded language, defendant LIZALDE told defendant A. SORIANO that

1  defendant LIZALDE had collected $50 in "taxes" from an associate and

2  that he would deliver the money to defendant A. SORIANO when

3  defendant A. SORIANO was in the "hood."

4      Overt Act No. 294:  On September 18, 2013, by telephone using

5  coded language, defendant A. SORIANO agreed to sell defendant NEGRETE

6  one half-ounce of methamphetamine for $230.

7      Overt Act No. 295:  On September 20, 2013, by telephone using

8  coded language, defendant MACIEL asked defendant J. LOPEZ if

9  defendant J. LOPEZ had any methamphetamine for sale, and defendant J.

10  LOPEZ said he would call defendant MACIEL back in 45 minutes.

11     Overt Act No. 296:  On October 25, 2013, by text message using

12  coded language, defendant REYES agreed to supply Mexican Mafia Member

13  #3 with six ounces of methamphetamine.

14     Overt Act No. 297:  On October 26, 2013, by text message using

15  coded language, defendant REYES informed Mexican Mafia Member #3 that

16  the six ounces of methamphetamine that Mexican Mafia Member #3 had

17  ordered was ready for pick-up.

18     Overt Act No. 298:  On October 26, 2013, by telephone using

19  coded language, defendant REYES asked Mexican Mafia Member #3 how he

20  wanted the six ounces of methamphetamine to be packaged, and Mexican

21  Mafia Member #3 asked for it to be separated into two three-ounce

22  packages.

23     Overt Act No. 299:  On October 29, 2013, by telephone using

24  coded language, Mexican Mafia Member #3 arranged to meet with

25  defendants A. RODRIGUEZ and ORTIGOZA at the Casa Perez restaurant in

26  Long Beach, California.

27     Overt Act No. 300:  On November 4, 2013, by telephone using

28  coded language, defendant A. RODRIGUEZ told Mexican Mafia Member #3

that defendant A. RODRIGUEZ' brother was incarcerated with a Mexican Mafia member and wanted to send "regards" to Mexican Mafia Member #3, and defendant A. RODRIGUEZ also told Mexican Mafia Member #3 that "Live Scan" was a program used by federal law enforcement, but that it had not been used on defendant A. RODRIGUEZ when defendant A. RODRIGUEZ was "out on the streets."

Overt Act No. 301: On November 7, 2013, by telephone using coded language, Mexican Mafia Member #3 told defendant A. RODRIGUEZ that Mexican Mafia Member #3 had been attempting to meet with defendants L. KELLY and ORTIGOZA and another unindicted co-conspirator, and defendant A. RODRIGUEZ told Mexican Mafia Member #3 that he was going to make a delivery and that his cousin had been sentenced to 115 months to life in prison.

Overt Act No. 302: On November 7, 2013, by telephone using coded language, Mexican Mafia Member #3 told defendant A. RODRIGUEZ that he had met with another unindicted co-conspirator, and defendant A. RODRIGUEZ told Mexican Mafia Member #3 that he had identified a law enforcement surveillance camera in the area and discussed plans for a meeting that night.

Overt Act No. 303: On November 13, 2013, by telephone using coded language, defendant A. RODRIGUEZ told Mexican Mafia Member #3 that defendant A. RODRIGUEZ was monitoring law enforcement communications concerning a shooting in San Pedro, and Mexican Mafia Member #3 told defendant A. RODRIGUEZ that Mexican Mafia Member #3 had something for defendant A. RODRIGUEZ to do when he saw him.

Overt Act No. 304: On November 18, 2013, by telephone using coded language, Mexican Mafia Member #3 ordered six ounces of methamphetamine from defendant REYES.

1    Overt Act No. 305:   On November 18, 2013, by telephone using
2    coded language, Mexican Mafia Member #3 informed defendant REYES that
3    he was on the street in front of REYES' residence, waiting to pick up
4    the six ounces of methamphetamine.

5    Overt Act No. 306:   On November 19, 2013, by telephone using
6    coded language, defendant A. RODRIGUEZ told Mexican Mafia Member #3
7    that defendant A. RODRIGUEZ had obtained his license and could do his
8    "rounds" for Mexican Mafia Member #3 and that defendant A. RODRIGUEZ
9    and another unindicted co-conspirator had taxes to deliver.

10   Overt Act No. 307:   On November 22, 2013, by telephone using
11   coded language, Mexican Mafia Member #3 told defendant ORTIGOZA that
12   his Probation Officer had just left and that defendant S. RODRIGUEZ
13   had delivered money for defendant SANCHEZ, but that defendant SANCHEZ
14   still owed money to defendant A. RODRIGUEZ; and defendant ORTIGOZA
15   told Mexican Mafia Member #3 that he had told defendant S. RODRIGUEZ
16   that she still owed $500, but that he was going to tell her that she
17   actually owed $600.

18   Overt Act No. 308:   On November 22, 2013, by telephone using
19   coded language, defendant A. RODRIGUEZ told Mexican Mafia Member #3
20   that he had money to deliver to Mexican Mafia Member #3, and Mexican
21   Mafia Member #3 told defendant A. RODRIGUEZ that he had spoken to an
22   unindicted "East-Side" gang member about a dispute within the
23   organization and asked if defendant A. RODRIGUEZ wanted to "get at" a
24   Mexican Mafia member in order to address the conflict.

25   Overt Act No. 309:   On August 18, 2014, defendant CORNEJO sold
26   approximately 431.5 grams of methamphetamine to a confidential
27   government informant for $4,300, at a parking lot in West Covina,
28   California.

Overt Act No. 310:  On August 26, 2014, by text messages using coded language, defendant CORNEJO agreed to sell one pound of methamphetamine to a confidential government informant for $4,100.

Overt Act No. 311:  On or about August 26, 2014, at a parking lot in West Covina, California, defendant CORNEJO sold approximately 371.4 grams of methamphetamine to a confidential government informant for $4,100 and agreed to deliver the remaining two ounces of methamphetamine later.

Overt Act No. 312:  On August 27, 2014, defendant CORNEJO distributed approximately 218.3 grams of methamphetamine to a confidential government informant at a parking lot in Los Angeles, California, and defendant CORNEJO explained that the package included the two ounces he owed as well as six ounces that he was "fronting."

Overt Act No. 313:  On September 8, 2014, defendant CORNEJO told a confidential government informant that he could "front" up to four pounds of methamphetamine.

Overt Act No. 314:  On September 11, 2015, defendant O. GUERRERO possessed approximately 20.28 grams of methamphetamine and cash, consistent with narcotics sales, in Wilmington, California.

Overt Act No. 315:  On September 28, 2015, defendant CORNEJO maintained "Pay/Owe" sheets and concealed approximately 1.176 kg of methamphetamine inside the door panel of a 2005 BMW sedan, before delivering the methamphetamine to two customers, in the presence of two small children, at a Target store parking lot in San Pedro, California.

Overt Act No. 316:  On July 11, 2016, Mexican Mafia Member #3 told incarcerated gang members that he had been informed by defendant A. RODRIGUEZ about and had "read the paperwork" on an inmate who had

provided information to law enforcement concerning a Mexican Mafia

associate which appeared in an indictment and that Mexican Mafia

Member #3 was "trying to take over Long Beach," so Mexican Mafia

Member #3 directed the incarcerated gang members to beat the inmate

and "fine" him $500 to teach the inmate to "keep his f*cking mouth

shut"; and one of the incarcerated inmates told Mexican Mafia Member

#3 that defendant A. RODRIGUEZ had previously given "a verbal"

authorization to attack the suspected informant.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about June 6, 2012, in Los Angeles County, within the Central District of California, defendant JOSE BECERRA, also known as "Sinaloa," knowingly and intentionally distributed at least five grams, that is, approximately 26.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about July 3, 2012, in Los Angeles County, within the Central District of California, defendant JOSE BECERRA, also known as "Sinaloa," knowingly and intentionally distributed at least five grams, that is, approximately 26.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about August 14, 2012, in Los Angeles County, within the Central District of California, defendant JUAN CARLOS HERNANDEZ, also known as "Negro Trece," knowingly and intentionally distributed at least five grams, that is, approximately 27.3 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about August 22, 2012, in Los Angeles County, within the Central District of California, defendant ERYANNA NEGRETE, also known as ("aka") "Baby Gangsta," aka "Baby G," knowingly and intentionally distributed at least five grams, that is, approximately 27.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about August 30, 2012, in Los Angeles County, within the Central District of California, defendant ERYANNA NEGRETE, also known as ("aka") "Baby Gangsta," aka "Baby G," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.4 grams, of methamphetamine, a Schedule II controlled substance.

## COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 12, 2012, in Los Angeles County, within the Central District of California, defendant JOSE HERNANDEZ AGUIAR, also known as "Big Joe," knowingly and intentionally distributed at least 50 grams, that is, approximately 55 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about September 26, 2012, in Los Angeles County, within the Central District of California, defendants ERYANNA NEGRETE, also known as ("aka") "Baby Gangsta," aka "Baby G," and EDWARD WILLIAM GUERRERO, aka "Toro," knowingly and intentionally distributed at least five grams, that is, approximately 45.0 grams, of methamphetamine, a Schedule II controlled substance.

## COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about October 18, 2012, in Los Angeles County, within the Central District of California, defendant JOSE HERNANDEZ AGUIAR, also known as "Big Joe," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about November 10, 2012, in Los Angeles County, within the Central District of California, defendant ERYANNA NEGRETE, also known as ("aka") "Baby Gangsta," aka "Baby G," knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 11.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about February 12, 2013, in Los Angeles County, within the Central District of California, defendant JUAN LOPEZ, also known as "Spanky," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about February 26, 2013, in Los Angeles County, within the Central District of California, defendant JAVIER FRAUSTO, also known as "Candyman," knowingly and intentionally distributed at least five grams, that is, approximately 27.5 grams, of methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about March 12, 2013, in Los Angeles County, within the Central District of California, defendant JUAN LOPEZ, also known as "Spanky," knowingly and intentionally distributed at least 50 grams, that is, approximately 83 grams, of methamphetamine, a Schedule II controlled substance.

## COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 15, 2013, in Los Angeles County, within the Central District of California, defendant JUAN LOPEZ, also known as "Spanky," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about May 16, 2013, in Los Angeles County, within the Central District of California, defendants MIGUEL MACIEL, also known as ("aka") "Goat," and JESSICA FRAUSTO, aka "Lil Jess," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 55.1 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about June 11, 2013, in Los Angeles County, within the Central District of California, defendant JUAN CARLOS HERNANDEZ, also known as "Negro Trece," knowingly and intentionally distributed at least 50 grams, that is, approximately 56.3 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about June 19, 2013, in Los Angeles County, within the Central District of California, defendant JESSICA FRAUSTO, also known as "Lil Jess," knowingly and intentionally distributed at least 50 grams, that is, approximately 56.3 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about June 25, 2013, in Los Angeles County, within the Central District of California, defendant JOSE HERNANDEZ AGUIAR, also known as "Big Joe," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about July 2, 2013, in Los Angeles County, within the Central District of California, defendants FRANCISCO HERNANDEZ, also known as ("aka") "Pancho," and OTONIEL GUERRERO, aka "Twin," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 109.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about July 9, 2013, in Los Angeles County, within the Central District of California, defendants FRANCISO HERNANDEZ, also known as ("aka") "Pancho," and ERYANNA NEGRETE, aka "Baby Gangsta," aka "Baby G," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 111.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about September 19, 2013, in Los Angeles County, within the Central District of California, defendants ARMANDO SORIANO, also known as ("aka") "210," aka "Mando," and DESIREE HERNANDEZ, aka "Dimples," aka "Dez," aka "Deserie," knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 32.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about August 18, 2014, in Los Angeles County, within the Central District of California, defendant RAUL CORNEJO knowingly and intentionally distributed at least 50 grams, that is, approximately 431.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about August 26, 2014, in Los Angeles County, within the Central District of California, defendant RAUL CORNEJO knowingly and intentionally distributed at least 50 grams, that is, approximately 371.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about August 27, 2014, in Los Angeles County, within the Central District of California, defendant RAUL CORNEJO knowingly and intentionally distributed at least 50 grams, that is, approximately 218.3 grams, of methamphetamine, a Schedule II controlled substance.

1

## COUNT TWENTY-NINE

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

3        On or about September 28, 2015, in Los Angeles County, within

4  the Central District of California, defendant RAUL CORNEJO knowingly

5  and intentionally distributed at least 50 grams, that is,

6  approximately 1,176 grams, of methamphetamine, a Schedule II

7  controlled substance.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY

[18 U.S.C. § 1512(a)(2)]

On or about September 16, 2013, in Los Angeles County, within the Central District of California, defendants LAWRENCE RUBLE KELLY, also known as ("aka") "Puppet," aka "Lil Puppet," aka "Pups," aka "P"; ARMANDO SORIANO, aka "210," aka "Mando"; and JEREMY WOODRUFF, aka "Solo," knowingly attempted to use physical force and the threat of physical force, with the intent to influence, delay, and prevent the testimony of another person in an official proceeding, and cause and induce the person to withhold testimony from an official proceeding, and otherwise to hinder, delay, and prevent the communication to a law enforcement officer and judge of the United States of information relating to the commission or possible commission of a federal offense.

COUNT THIRTY-ONE

[18 U.S.C. § 922(g)(1)]

On or about January 24, 2013, in Los Angeles County, within the Central District of California, defendant SUSANNA RODRIGUEZ ("S. RODRIGUEZ"), knowingly possessed a Mossberg .410 gauge shotgun, bearing serial number K255074, in and affecting interstate commerce.

Such possession occurred after defendant S. RODRIGUEZ had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

1. Transportation of a Controlled Substance, in violation of California Health and Safety Code Section 11379(a), in the Superior Court of the State of California, County of Los Angeles, Case Number XSONA06959301, on or about July 17, 2006; and

2. Receiving Stolen Property, in violation of California Penal

1    Code Section 496(a), in the Superior Court of the State of

2    California, County of Los Angeles, Case Number SBAYA06484602, on or

3    about October 17, 2006.

4

5                                        A TRUE BILL

6

7                                        /S/
                                         ─────────────────────
                                         Foreperson

8    EILEEN M. DECKER
     United States Attorney

9

10

11   LAWRENCE S. MIDDLETON
     Assistant United States Attorney

12   Chief, Criminal Division

13   JUSTIN R. RHOADES
     Assistant United States Attorney

14   Chief, Violent and Organized
        Crime Section

15

16   CHRISTOPHER BRUNWIN
     Assistant United States Attorney

17   Violent and Organized Crime
        Section

18

19

20

21

22

23

24

25

26

27

28